518 So.2d 1059 (1987)
Henry WEYSHAM
v.
Raymond B. HARNEY, Gayle Harney, Latter & Blum, Inc. and Beverly Smith.
No. CA-6992.
Court of Appeal of Louisiana, Fourth Circuit.
October 7, 1987.
Rehearing Denied February 11, 1988.
Writ Denied March 25, 1988.
*1060 George B. Recile, John D. Lambert, Jr., Lambert & Lambert, Jonathan M. Lake, New Orleans, for appellees.
Gibson Tucker, Jr., New Orleans, for plaintiff-appellant.
Before BARRY, BYRNES and ARMSTRONG, JJ.
BYRNES, Judge.
By this appeal, plaintiff-appellant Henry Weysham, seeks reversal of a judgment maintaining the reconventional demand of defendant-appellees Raymond and Gayle Harney, Beverly Smith and Latter and Blum Inc. We agree with appellant's position and reverse the ruling of the trial court.

FACTS
This matter arose out of a failed real estate transaction. In June, 1981 appellant, Weysham, signed an agreement to purchase property located at 709 Marguerite Road in Metairie from appellees Raymond and Gayle Harney. Latter and Blum was the listing broker and Beverly Smith was the selling agent. The agreement specified a purchase price of $125,000.00, a $25,000.00 down payment, and a $12,000.00 deposit, ($2,000.00 cash and a promissory note for the remaining $10,000.00). The balance of the purchase price was to be financed by a mortgage. The agreement to purchase was subject to the following suspensive condition:
Should purchaser, seller or agent be unable to obtain the loan stipulated above within 45 days from acceptance hereof, this contract shall then be null and void and the agent is hereby authorized to return the purchaser's deposit in full. Commitment by lender to make loan, subject to approval of title shall constitute obtaining of loan. Purchaser obligates himself to make good faith application for required loan(s) within 10 days of acceptance.
To comply with his obligation to seek financing, Weysham submitted a loan application to Fidelity Homestead Association. He chose this institution in part because his CPA, Mr. Hogan, was also an official of Fidelity and a member of its loan approval committee. On his application, Weysham listed his annual income as $125,000.00 and his occupation as self-employed owner of two hairstying franchises doing business as Command Performance.
Although it was not clear from the application, Weysham's personal income was not anywhere near $125,000.00. Instead that figure reflected the projected profit of his two solely owned corporations in whose names the hairstyling franchises were placed. At Fidelity's request, Weysham submitted his personal tax return for the years 1979 and 1980. When these returns showed a personal income of approximately $5,000.00 a year, Fidelity rejected the application based on insufficient income. Weysham then requested the return of his deposit as provided in the purchase agreement. He was refused on the ground that he had not made a good faith effort to obtain financing. The basis for this contention was that he had either misrepresented his annual income to Fidelity by including projected corporate earnings, or had failed to provide the documentation to support his claimed income by not producing corporate tax returns.
Weysham then sued the Harneys (sellers), Beverly Smith (agent) and Latter & *1061 Blum (broker) to recover the deposit. The defendants reconvened, seeking forfeiture of the deposit, payment of real estate commissions, and attorneys fees. The sellers also sought additional damages arising from their commitment to purchase another home, which they claimed was made in reliance on Weysham's agreement to purchase their old home. At the close of trial, the judge ruled in favor of the defendants granting all reconventional demands except the demand for damages arising from the seller's commitment to buy a new house. The judge's ruling was based on his conclusion that Weysham did not make a good faith attempt to obtain financing. After a careful review of the record, we are unable to agree with this conclusion.
Black's Law Dictionary defines bad faith as:
The opposite of `good faith', generally implying or involving actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties but by some interested or sinister motive.
See also C.C. Art. 1997, comments (b) & (c). The term bad faith means more than mere bad judgment or negligence, it implies the conscious doing of a wrong for dishonest or morally questionable motives. In our opinion the record in this case does not support a finding that the appellant acted in bad faith.
At trial, Weysham testified that he did not think he had to distinguish between income generated by his two solely owned corporations and his own personal income in applying for the loan. While this may be an inaccurate assumption, it does not in itself imply bad faith. Weysham further testified that he had always thought of the income of his corporations as his own, and didn't realize that the bank wouldn't treat this as his income until they rejected his loan application. The application clearly states that Weysham is self-employed as the owner of a hairstyling franchise. There was no attempt to conceal the true state of Weysham's affairs or the source of his income. It's true that Weysham did not submit tax returns for his corporations as part of the loan process, however, it is also true that he was not asked to do so by Fidelity. Moreover, Weysham's CPA, whose firm kept all his records and prepared both his personal and corporate tax returns, was a director of Fidelity as well as a member of its executive and loan approval committees. Under these circumstances, it does not seem unreasonable for Weysham to have assumed that his CPA would let him know if additional documentation was needed to support or clarify his loan application.
Three separate officials of Fidelity, including Mr. Hogan, testified at trial. All three testified unequivocally that Weysham cooperated fully in the loan application process, provided any and all information requested from him, and in no way delayed, obstructed, or hindered the loan. Mr. Hogan also testified that at the time of the loan application, Weysham's corporations were just getting started, making it impossible for him, as a CPA, to prepare corporate financial statements or be in a position to judge the projected cash flow of the business. Because the corporations had been recently formed, figures from Weysham's previous corporation (a Piggly-Wiggly grocery store) were either unavailable or irrelevant. Mr. Hogan specifically testified that he was never instructed by Weysham to withhold any information concerning his corporations from the loan committee.
Unless the trial judge totally disregarded the testimony of the three witnesses from Fidelity, we cannot see how he reached the conclusion that Weysham applied for the loan in bad faith. None of those witnesses indicated, even obliquely, that they were misled or deceived by Weysham. Moreover, their testimony reveals that even if Weysham had attempted to apply for the loan in the name of his corporations he would have been rejected because his personal income would not have satisfied Fidelity's requirement that corporate loans be backed by the personal guaranty of a major stockholder. In short, no matter how Weysham had presented his financial *1062 picture to Fidelity at the time of his application he would have been rejected. This may have been bad timing on his part, but it was not bad faith. The record simply does not support the conclusion that Weysham misrepresented or withheld information from Fidelity in order to assure rejection of his loan application. The trial court was manifestly wrong to conclude otherwise and his judgment is therefore reversed. Costs of this appeal are to be paid by the appellees.
REVERSED.