607 So.2d 865 (1992)
Bruce Sheldon BOND, et ux.
v.
Freddie BROADWAY.
No. 24075-CA.
Court of Appeal of Louisiana, Second Circuit.
October 28, 1992.
Rehearing Denied November 25, 1992.
Writ Denied February 8, 1993.
Davenport, Files and Kelly by J. Edward Patton, II, Monroe, for appellants.
Hunter, Scott, Blue, Johnson, & Ross by Willie Hunter, Jr., Monroe, for appellee.
Before NORRIS, VICTORY and BROWN, JJ.
VICTORY, Judge.
This case involves the breach of a purchase agreement to buy a residential home in which the homeowners, Bruce and Pamela Bond, initially sought specific performance against the prospective buyer, Freddie Broadway. During the pendency of the suit, the Bonds sold their home to a third party and converted their action into one for damages, a claim which the trial court *866 rejected because a profit was made on the subsequent sale. The Bonds now appeal arguing that they incurred a substantial amount of damages, even after a reduction for profit from the subsequent sale. We agree, reverse the trial court's decision and award damages to the Bonds.

FACTS
In the spring of 1989, Bruce and Pamela Bond listed their home in Monroe with a realtor intending to sell it so they could purchase a new home. On July 11, 1989, Freddie Broadway offered to buy the property for $85,988. That same day the parties entered a purchase agreement, which terms included a $30,000 cash payment and an assumption of the approximate balance of $55,988 on the outstanding mortgage. The home was to be sold "as is", subject to the buyer's final inspection. In addition, the agreement provided for specific performance in the event of non-performance by the other party, all costs associated with a default and the award of attorney's fees. Broadway put down a $500 deposit with the Bond's realtor to secure the purchase of the home, pending the approval of the assumption and Broadway's final inspection. The closing date was set for August 11, 1989.
Once Broadway's assumption of the mortgage was approved, the Bonds then finalized a separate and unrelated contract to buy a new home. The Bonds intended to use the $30,000 cash from the sale of their old home for a down payment on their new home.
Before the closing date, Broadway made two more visits to the home for inspection. After his final visit, the day before the closing, he informed the Bonds that he was not going to buy the home because of several alleged defects he had not previously noted or been informed of, but that were now evident to him. Since the Bonds had already finalized their contract on a new home, they were required to obtain a second mortgage on the home to obtain the $30,000 down payment for the new home.
The Bonds then filed suit against Broadway seeking specific performance of the purchase agreement. However, during the pendency of the suit, about eight months after Broadway refused to purchase the home, the Bonds sold their home to a third party, Carolyn Augustine, for $89,900. Once this occurred, the Bonds converted their suit for specific performance into an action for damages. In the amended petition, the Bonds asked for the total amount of mortgage payments made during the eight-month period between the original August 11th closing date and the sale of the home to Ms. Augustine, nearly $3,800. They also sought the interest they paid on the $30,000 borrowed through the second mortgage, amounting to nearly $2,000, or, at the very least, legal interest on the cash down payment. In addition, they sought other necessary expenses associated with the breached purchasing agreement, including the costs of closing the sale to Ms. Augustine and attorney's fees. The Bonds alleged their damages should be reduced by the amount of profit they realized on the subsequent sale of the home.
At trial, the judge ruled that the defects complained of by Broadway were not sufficient to vitiate the purchase agreement because the defects were discernable upon a reasonable inspection of the property. But for the subsequent sale of the property to Ms. Augustine, the judge stated he would have awarded specific performance. However, no damages were awarded to the Bonds because the judge found that any loss they incurred due to the breached agreement did not exceed the profit they received from the subsequent sale plus Broadway's $500 deposit. In addition, the court refused to allow the Bonds to introduce evidence of damages incurred related to the purchase of their new home, reasoning there was nothing in the purchase agreement related to the purchase of another home. However, costs in the trial court were assessed to Broadway.

DISCUSSION
The measure of damages due the Bonds is based on a determination of whether Broadway's breach of the agreement was in good or bad faith. An obligor in good *867 faith is liable only for the damages that were foreseeable at the time the contract was made, LSA-C.C. Art. 1996. However, an obligor in bad faith is liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform, LSA-C.C. Art. 1997.
Black's Law Dictionary defines bad faith as:
The opposite of `good faith', generally implying or involving actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties but by some interested or sinister motive.
See also LSA-C.C. Art. 1997, comments (b) and (c). The term bad faith means more than mere bad judgment or negligence, it implies the conscious doing of a wrong for dishonest or morally questionable motives. Weysham v. Harney, 518 So.2d 1059 (La. App. 4th Cir.1987), writ denied 521 So.2d 1172 (La.1988).
Here, we must look to the language of the purchase agreement, and the actions of Broadway in relation to that agreement, to determine whether he was in bad faith. The written agreement, which was provided by Broadway's realtor, stated that the home would be sold "as is", subject to the buyer's final inspection. A sale made "as is" is not a waiver of all warranties. The vendor is not relieved of the implied warranty under LSA-C.C. Art. 2520 that the thing must be fit for the use for which it is intended. However, the "as is" stipulation, especially in the sale of a used thing, means that the thing is not warranted to be in perfect condition and free of all defects which prior usage and age may cause. Creger v. Robertson, 542 So.2d 1090 (La.App. 2d Cir.1989).
The defects which Broadway claim caused him to refuse to buy the home include: the excessive depth of the swimming pool, minor cracks in the slab, an unlevel patio, damage to the fence, a cracked fireplace, exterior trim decay, a cracked rain gutter, decayed door frames, decayed cornice boards, unkept baseboards, torn wallpaper, a warped carport door, falling insulation, unprotected electrical wiring and poor drainage. After examining the photographs which depict the alleged defects and reviewing the testimony concerning these problems, we agree with the trial judge that these were all minor problems, easily discoverable by simple inspection and were not sufficient cause to refuse to honor the agreement.
There is no evidence that Broadway was misled to believe that any of these minor problems were nonexistent, or that he was ever refused access to the home by the Bonds for an inspection. Although Broadway signed a purchase agreement after only inspecting the home for 15-20 minutes, there is no evidence that he was pressured or coerced into signing the agreement. He had almost a full month to inspect the house prior to the closing, but waited until the night before the closing date to complain of the alleged defects and give notice of his intent to refuse to buy the home. Although the contract provided that the sale was subject to Broadway's final inspection, we do not read this provision as allowing him to simply refuse to purchase the home at the last moment, citing minor problems that were easily discoverable by simple inspection.
Based on these facts, we conclude that Broadway was in bad faith in breaching the purchase agreement. The minor nature of the defects he raised as the basis for his breach, coupled with the "as is" language in the purchase agreement, prove that the complaint of defects was simply a pretext on Broadway's part to attempt to escape his contractual obligations to the Bonds. Compare Weysham v. Harney, supra.
Since Broadway was in bad faith, he is liable for all damages, foreseeable or not, that are a direct consequence of his failure to perform. LSA-C.C. Art. 1997. Although the trial judge did not allow into evidence proof of many of the damages that were sustained by the Bonds as a result of the breach, a proffer was made, on the record, which details these damages.
*868 The Bonds were required to make seven additional payments on their mortgage note after the breach, totaling $3,802. They also paid $2,006.51 in interest on the $30,000 note that they would not have had to pay had the breach not occurred. In addition, other damages include $264.91 in repairs necessary to sell the house to another buyer, $759.47 in closing costs for the subsequent sale, and $58.54 in unrefunded utility deposits for a system check regarding the subsequent sale. All of these expenses, foreseeable or not, resulted from Broadway's breach and would not have been incurred had there been no breach.
These expenses as a result of the breach total $6,891.43. However, this figure must be reduced by the amount of profit from the subsequent sale, $2,995.81, and the $500 deposit paid by Broadway. The record reflects that the deposit is apparently held in escrow by the Bonds' realtor, who should now release these funds to the Bonds. Therefore, we find Broadway responsible for these net damages of $3,395.62.
The purchase agreement also requires the defaulting party to pay reasonable attorney fees which are recoverable as an element of damages if provided for in a contract. Bellsouth Advertising & Publishing Corporation v. Gassenberger, 565 So.2d 1093 (La.App. 4th Cir.1990). The record reflects the Bonds were charged reasonable attorney fees up to the appellate level totaling $2,362.66. We add to that amount $1,000 for services rendered to the Bonds by their attorney on appeal.
We find no error the lower court's decision to order costs in the trial court to be paid by Broadway.

DECREE
For the forgoing reasons, the judgment of the trial court is reversed in part, and judgment is hereby rendered in favor of plaintiffs, Bruce Sheldon Bond and Pamela Stansberry Bond, and against defendant, Freddie Broadway, in the sum of SIX THOUSAND SEVEN HUNDRED FIFTY-EIGHT DOLLARS and 28/100 ($6,758.28), together with legal interest from date of judicial demand. The judgment of the trial court assessing trial court costs to Freddie Broadway is affirmed. All costs in this court are to be paid by Freddie Broadway.
AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.

APPLICATION FOR REHEARING
Before NORRIS, HIGHTOWER, VICTORY, BROWN and STEWART, JJ.
Rehearing denied.