CARAWAY, J.
|! Plaintiff egg producer appeals the summary judgment which dismissed claims for breach of contract and unfair trade practices filed against a poultry company and two individual employees. The contracts between the parties had been in force for a number of years when the defendants determined to end the contracts by the exercise of an at-will termination provision. The defendants assert that the contracts were terminated in good faith due to the mismanagement of the farm by plaintiff. Finding material issues of fact, we reverse.

*744
Facts

In January of 2004, Dan and Diane Vo-lentine (hereinafter “Plaintiffs”), entered into two Hatching Egg Production Contracts (hereinafter collectively the “Contract”) with Raeford Farms of Louisiana LLC (“Raeford”), for the raising and management of breeder hens for egg production. Dan Volentine (“Volentine”) was classified as a breeder farmer who managed the parent flock which produces eggs for the broiler crop, sold to consumers. The male and female chickens provided to Volentine produced eggs received by Rae-ford that were later hatched and raised as broilers.
Under the Contract, Volentine was required to provide housing, labor and equipment. Raeford agreed to provide flocks, feed and medication to Volentine. Volentine was paid for housing the chickens and egg production and awarded “hatchability” and feed conversion bonuses for certain levels of production. The breeder flock life period with the producer farms is 12about 44 weeks, after which time the flock is removed and a new flock delivered. The Contract provided no term of years for the parties’ agreement.
In carrying out the Contract, Volentine dealt with Raeford employees, Samuel Le-Narz, Live Operations Manager, and Kelly Garris, Breeder Manager for Raeford Farms. Inspections of the farm by Rae-ford employees occurred on a continuous basis. Garris participated in some of the inspections of the Volentine farm but the majority of them were done by another Raeford employee, Chris Ovitt.
In late spring (May 11) and early summer (June 8) of 2007, two catastrophic events occurred at the Volentine farm because of electrical power losses. Six thousand hens were lost. In response, Raeford requested correction of substandard conditions for the housing including the replacement of electrical breakers which regulated the temperature of the chicken houses.
By August of 2007, Raeford threatened to withhold placement of chickens due to uncorrected farm deficiencies. Specifically, Raeford required Volentine to install a working alarm system and noted issues with feed lines, feeding, water line, cool cells and fans. When the alarm system was not installed, Raeford withheld flock delivery scheduled for October of 2007.
Correspondence addressed to Volentine from Raeford on November 13, 2007, indicated that some progress had been made in the correction of deficiencies. Nevertheless, on November 16, 2007, Raeford again withheld [Rflock delivery due to Vo-lentine’s lack of complete compliance with requested repairs. Volentine expended $116,000 in repairs. Ultimately, flock delivery occurred on November 30, 2007, and an additional flock was delivered on January 4, 2008.
Thereafter, inspections of the Volentine farm through August of 2008 indicated continuous problems with lighting and fans, feeding times, fill tubs, egg collection, feed distribution and collection, dead bird collection, cool cell, water pressure, temperature and sanitation issues as well as new employee problems. On August 1, 2008, a meeting between Volentine, his banker, Wade Holloway, and Garris, Ovitt and LeNarz occurred. Raeford expressed continued concern with Volentine’s management practices and egg production rates. The meeting documentation indicates that Raeford announced its decision to no longer supply birds to Volentine. Raeford offered two options — lease or sale of the farm. Raeford declined to deal with Volentine’s son due to his poor management skills.
After the August meeting, the flocks were removed from Volentine’s farm in the *745 normal course of business on September 3 and October 13, 2008. On October 2, 2008, Garris sent a letter to Volentine formally terminating the Contract between Volen-tine and Raeford, effective November 1, 2008, because Volentine had “breached” contractual duties and “defaulted under the terms and conditions of the contracts.” Raeford informed Volentine that his failure to remedy “numerous deficiencies” and “substandard conditions” after repeated requests to do so would result in no more deliveries of chickens.
RRaeford’s letter emphasized the deficiencies of Volentine’s management beginning in 2007. The termination letter indicated that “since that time,” Volentine had continued to breach the contract as follows:
You have continued to breach your contractual obligations by operating your farm in a substandard manner. Raeford Farms has repeatedly informed you of problems with birds being fed, eggs being gathered, fighting in the house, water fine issues, cooling cell issues and fans. You have continuously failed to remedy these problems despite being warned that your contracts would be terminated if these deficiencies were not corrected. Also in the contracts you agreed to properly dispose of dead birds, manure and poultry fitter in accordance with government regulations and Raeford Farms’ recommendations. You have been informed on several occasions that Raeford Farms observed violations with regard to your disposal of dead birds. You have chosen to ignore these warnings and have consistently failed to dispose of dead birds in an acceptable manner. In the contracts, you also agreed to use your best efforts to maintain the breeder hen flock in such a manner that maximum egg production and hatchability would result. You have not fulfilled this obligation as your egg production has consistently been below our acceptable farm average.
Raeford Farms has been very patient with you and has given you numerous opportunities to remedy the substandard conditions of your farm; however, you have continuously failed to address our concerns and correct the deficiencies in your farming operation. As a result of your actions which have endangered or impaired Raeford Farms’ property and your failure to comply with the provisions of your contracts, Raeford Farms has been left with no other option but to terminate your contracts. This decision to terminate your contracts is a final decision, and you have no appeal rights with respect to this decision.
Raeford offered to allow Volentine to sell or lease the farm to an approved contractor and again informed Volentine that his son’s purchase or lease of the farm was not a viable option.
On September 23, 2009, Volentine instituted suit against Raeford Farms of Louisiana, LLC, Columbia Farms of Georgia, Inc., House of Raeford Farms of Louisiana, LLC, House of Raeford Farms, Inc., Samuel | sLeNarz and Kelly Garris (collectively, “Raeford”), alleging claims of breach of contract, tortious interference with contractual rights, intentional interference with business relations and violations of the Louisiana Unfair Trade Practices Act (LUTPA) in violation of La. R.S. 51:1401, et seq. Volentine alleged that Le-Narz and Garris acted maliciously, deceptively, unfairly, with spite and ill will, and without good faith in their dealings with Volentine, as evidenced by: (1) instructing Ovitt to write at least three deficiencies every time he inspected the chicken houses; (2) alleging deficiencies when other nearby farms were not cited or noted for the same alleged deficiencies; (3) claiming *746 deficiencies and problems which were nonexistent, false and/or unsubstantiated; (4) allowing Volentine to further encumber his personal property and incur additional debt when they knew the Contract would be terminated; (5) refusing to allow Volen-tine to lease the chicken houses to his son Kevin; (6) delaying or attempting to delay the implementation of the feed system and telephone alarm system when these matters were used as a basis for withholding chickens from Volentine; and (7) imposing unreasonable and unattainable conditions upon Volentine in the management and operation of the chicken houses as well as the termination of the Contract.
Based upon these allegations, Plaintiffs claimed that Raeford caused extreme emotional distress due to the loss of their livelihood of the past 20 years, loss of the family home and land which Volentine had inherited from his parents, embarrassment and humiliation associated with foreclosure proceedings and damage to his reputation in his community.
| (¡Relating to each specific cause of action, Volentine alleged that Raeford Farms, though LeNarz and Garris, as directors and officers, failed to administer and terminate the Contract in good faith, caused Raeford Farms to breach the Contract and/or make Volentine’s performance of the Contract impossible or more burdensome, intentionally interfered with Vo-lentine’s business relationship with Rae-ford Farms and was guilty of deceptive and unfair acts in trade or commerce that offended public policy.
The provisions of the Contract central to this dispute and Raeford’s termination of the Contract are, as follows:
2. Duties of the Producer.
⅜ * *
B. The Producer agrees to cooperate with the Company in adopting and/or installing new proven management practices and equipment.
[[Image here]]
F. The Producer will maintain all-weather roads to poultry houses and keep feed bins free of any overhanging wires or other obstacles and with adequate space to turn vehicles where necessary. Failure to provide such roads and turning area will make Producer liable for wrecker or towing charges in addition to any other damages the Company may sustain. Producer must provide approved pads for mechanical loading and unloading equipment.
G. The Producer agrees to properly dispose of dead birds, manure, and poultry litter in accordance with Government Regulations and Raeford Farms of Louisiana, LLC recommendations.
[[Image here]]
4. Best Efforts. The Producer and the Company agree to use their best efforts in maintaining the breeder hen flock in such a manner that maximum egg production and hatchability will result.
⅜ * ⅝
10. Events of Default. Any of the following events or occurrences shall constitute a default by the Producer under this Agreement:
A. Default under any separate but farm related financing agreement with a lending institution.
B. Actual or attempted levy, seizure or attachment of any of the Company’s property.
C. Use of abusive language, threat of physical harm or in any way impeding the Company or its authorized representatives from inspecting or examining the Producer’s facilities and flocks.
[7P. Insolvency or bankruptcy of the Producer.
*747 E. Failure of the Producer to properly care for and protect any of the Company’s property.
F. The occurrence of any event which in the opinion of the Company endangers or impairs the Company’s property.
G. Failure of the Producer to comply with any provision of this contract.
H. Failure of Producer to consistently produce hatching eggs in an efficient competitive manner.
11. Remedies of Company. Upon default or breach of any of the Producer’s obligations under this agreement the Company may immediately cancel this Agreement by giving notice in writing, and the Company may, without further notice, delay or legal process, take possession of poultry, feed or other property owned by the Company. The Company shall have the right to utilize, without cost, the Producer’s hatching egg production facilities until the flock is ready for slaughter. The Company may also pursue any other remedies at law or equity.
[[Image here]]
16. Term of Contract. It is expressly understood and agreed between the parties hereto that the terms and conditions of this Agreement shall remain in effect unless terminated as herein provided. Either party may terminate this Agreement only at the time a particular flock of hens and cockerels is delivered to the Company prior to the Company’s placement of hens and cockerels with the Producer by delivering notice of termination by certified mail or personal delivery. Producer understands and agrees that no agent, servant or employee of the Company has authority to make any oral modifications to this Agreement. Modification of this Agreement may only be accomplished by written instrument fully executed by the Producer and an authorized representative of the Company.
On April 30, 2012, Raeford filed a Motion for Summary Judgment seeking dismissal of all claims. Attached to the motion were excerpts from Volentine’s deposition. Volentine discussed his problems at the farm in 2007 and the expenditures he made in updating his houses. He testified that LeNarz had personal issues with him resulting from the 2007 conflict.
Volentine admitted that in April of 2008, he had lost two long-time employees who collected eggs and disposed of dead birds. He hired new employees who did not possess the necessary job performance attributes. |sHe terminated them after three to four weeks and two other persons were employed. These employees worked for Volentine for less than three weeks. Thereafter Volentine and his wife began operating the houses from May through September of 2008 when the flocks were finally removed by Raeford. During that time Volentine had only part-time help. Volentine conceded that he also had chain feeder and cool cell problems for which Raeford supplied PVC pipe.
Volentine agreed that lighting in the houses was very important because it stimulated egg production. When shown photographs of the lighting on his farm, Volentine conceded that some were not working. He also agreed that it was a chronic issue on his farm that could not be corrected with birds in the houses.
Volentine admitted that Raeford paid a $7,700 electric bill for him in 2008. He stated that “it wasn’t that I couldn’t pay it. I just thought they ought to be involved in the — the issue.” Volentine indicated that he “just wasn’t going to spend no more.” He did not believe that the electric compa *748 ny would turn off the lights with birds in the houses. He felt the easier way was to let Raeford pay the bill and then he would pay them back. He understood that this was his obligation under the contract, but he had done it before.
Volentine indicated that Ovitt told him in the summer of 2008 that he was required to find three deficiencies every time he inspected the farm. Only Volentine and his wife witnessed the statement by the inspector. | gVolentine believed that LeNarz was behind Raeford’s repeated attempts to justify termination of the contract.
Portions of Garris’ deposition and her separate affidavit were submitted in support of the summary judgment. She became Broiler Manager[1] for Raeford in 2000 and then Breeder Manager in September of 2007. Garris initially met Vo-lentine because of her supervision of his son Kevin’s broiler farm. Regarding breeder farming, she explained that pullets are placed on the egg hatching farms, fed a different regimen and then provided special lighting to precipitate egg production within four weeks. The eggs are collected and sent to a hatchery.
Garris testified that during the flock life of 44 weeks, an 88% survival rate of the flock is preferred. In all, she testified that the breeder would lose approximately 700-800 birds in the 44-week period. Mortality can be attributed to many things other than management.
Garris emphasized that Subsection 2B of the Contract provided that the producer (Volentine) agreed to cooperate with the company in adopting or installing new proven management practices and equipment. She explained that these provisions mean that the producer must cooperate with the company’s management suggestions. In other words, “if there’s proven practices that can increase his production, then that’s what we expect that we want done.”
Garris discussed the various problems concerning the Volentine farm. Mechanical and management problems were enumerated. She stated that 110the reason the Contract was terminated was because Vo-lentine would not address these problems. As to actual egg production, she stated that the decreased production was “somewhat” of a ground for default. She admitted that Volentine had been a good producer and very competitive in the past, but “things had changed.”
Garris stated that the average number of eggs expected by Raeford was 142 eggs per hen. The economics justified for that measure was not explained. The flock placed on Volentine’s farm on November 30, 2007, and sold on September 3, 2008, produced only 127.94 eggs per hen or 14.06 eggs less per hen than what is expected. The January 4, 2008 flock sold on October 13, 2008 produced only 127.86 eggs per hen or 14.14 less per hen than what is expected. Garris stated that she compared these two numbers to two other breeder farms which produced 146.51 eggs per hen and 141.15 eggs per hen. Garris described the Volentine deficiency as a significant number.
Garris identified photographs that she took of Volentine’s farm on July 11, 22, and August 17, 2008, which depicted the conditions on the farm, including improper bird disposal. The photographs taken by Garris were attached to the affidavit and show buckets of dead bird parts, dead birds on the premises, inside the houses and eggs strewn about the houses.
*749 Portions of LeNarz’s deposition were included in support of the summary judgment. LeNarz testified that he became Raeford’s Live Production Manager in 2007. He oversaw both broiler and breeder farms including the Volentine farm. LeNarz testified that in his opinion farmers |ndid not “have to exert a lot of management” in order to qualify for bonuses. LeNarz stated that “Dan was lazy. Volen-tine did not require his hired help to comply with our expectations.” LeNarz testified that Volentine would not feed the birds, supply water to the birds or keep the birds cool. In his words, “they would not keep equipment operating. We had problems with the service road to the farm.” He explained that “we had a multitude of issues on that farm with dead bird disposal.” LeNarz determined that Volen-tine was a poor farmer within two months after taking the job. He stated that there were other farmers who were not meeting standards. He treated them all the same and worked with them to improve. Le-Narz stated that Volentine’s productivity would not increase because Volentine “would not conform.” LeNarz recalled that Volentine continued to be written up on service reports and “there would be discussions conducted with him.”
Additional exhibits which were excluded from the record in support of the summary judgment were supplemented to this court on February 28, 2013. These exhibits included:
(1) Unexplained Hen Report.
(2) March 25, 2008 letter from Garris to an unidentified Raeford employee regarding Raeford’s payment of $904.40 bill which was deducted from Volentine’s income.
(3) April 14, 2008 letter to the same employee from Garris that instructed the employee to deduct from Volentine’s income amounts paid by Raeford for rock and dirt work done on Volentine’s farm in the amount of $5400.
(4) July 28, 2008 memo from LeNarz to Dennis Beasley (Raeford co-owner) regarding Volentine Farm indicated that Volentine was “our worst producing farm.” The memo noted that the current situation on the farm was “atrocious” and that his production was below Raeford’s standards. The memo reviewed Volentine’s history through the end 11i;of 2007. The memo indicated that inspectors continued to find dirty egg pack, dead birds not picked up and rotting through slats. The notes indicated that suspected improper disposal of dead birds was occurring, that current production at 50 weeks was below the standard by 17.6 eggs per hen and at 55 weeks was below the standard by 13.9 eggs per hen. The memo also indicated that Raeford paid Volentine’s electric bill to avoid termination of power. Le-Narz indicated that “Dan is a terrible money manager,” who was selling cows to make ends meet. LeNarz felt that Volentine was on the verge of bankruptcy and did not seem to care. Notations regarding inspection findings indicated that coolers were off, lights were turned out and various other problems. Le-Narz proposed to buy him out or lease his farm or “shut him down and take the next batch of birds” to another company.
(5) Memo memorializing the August 1, 2008 meeting indicated that at the meeting events of 2007 were discussed. Gar-ris recapped issues continuing to take place on the farm. Problems included bird feeding, egg gathering, lights, cooler, cool cells, dead bird disposal and non-payment of bills. Memo indicated that Volentine’s “running average” was 142 which was 8 eggs below Raeford’s farm average and 14 eggs below the AgriStat average. Volentine was given *750 two options, lease or sell the farm. A buyer or lessor was required within two weeks.
Volentine opposed the summary judgment specifically contending that issues of material fact remained as to the good faith termination and administration of the Contract. Volentine attached different portions of Garris’ deposition in opposition to the summary judgment. In those portions, Garris admitted that in some sense she would consider it a breach of the agreement if the producer failed to honor management wishes regarding the running of the houses. She explained, however, that there were different levels of management, minor mismanagement and gross mismanagement and that Raeford dealt with minor mismanagement every day. Violations of animal welfare laws were a form of gross mismanagement in Garris’ opinion. She admitted that Raeford was the sole arbiter of what constituted major or minor mismanagement.
11sGarris admitted that Volentine received feed conversion bonuses for both units for the final flocks in 2008 and a hatch bonus for one unit. She conceded that in 2007 there were 12 catastrophic events between the broiler, breeder and pullet farms. She could not say if any other farmers’ contracts had been terminated as a result of such events. She also admitted that Volentine was the only farmer terminated as a result of default.
Garris testified that Raeford required all producers to install dial-up paging alarm systems at the producers’ cost. Garris admitted that Volentine would not have gotten birds if 100 percent of the problem list had not been corrected in November of 2007. She knew that the repairs cost Vo-lentine a large amount of money. Garris was involved in some of the inspections that took place after the birds were placed. She did not recall that Volentine had spent $116,000 in 2007 in upgrades or that he was strapped for cash.
Portions of LeNarz’s deposition were included in opposition to the summary judgment. LeNarz explained that there were two types of incentives paid to producers at the end of their flocks based upon hatchability and feed conversion to encourage growers to manage their flocks efficiently to increase hatching. The standards were not very high and most of the producers got them. He explained that the “bars were low” such that if the producer got a bonus it did not mean he was doing a good job. If, however, the producer did not get a bonus it meant that he was probably doing a very poor job.
LeNarz stated that he would discuss a farm’s profitability with the farmer’s banker if there were concerns. He did not always inform the |14producer. He had met with several bankers including Volen-tine’s banker. LeNarz conceded that he contacted Wade Holloway without prior authorization. LeNarz requested that Holloway come to the August 1, 2008 meeting.
Volentine’s affidavit was submitted in opposition to the summary judgment. In it, he stated that in 2005, he spent in excess of $200,000 upgrading equipment. He indicated that in 2005 and 2006, he operated his farm without incident. In May and June of 2007, due to a loss of power, he lost chickens. During June through October of 2007, Volentine expended an additional $116,000 in upgrades to his farm.
A May 26, 2009 letter from Raeford, via LeNarz, to its producers was submitted in opposition to the summary judgment. The letter required the installation of dial-up paging alarm systems on every farm prior to July 3, 2009. Previously this requirement occurred only after catastrophic loss.
*751 Numerous visitation reports of Volen-tine’s houses by Chris Ovitt and Garris are a part of the record as follows:
December, 21, 2007 (Ovitt) — rooster feeding problems, light out, birds look good.
December 28, 2007 (Ovitt) — light out in 1st house, make sure to follow feeding schedule, birds look good.
January 2, 2008 (Ovitt) — both houses have lights out, 2 fans with problems, birds look good.
January 11, 1008 (Ovitt) — middle door not staying closed, on Jan. 9, one house did not feed on time, fill system breaker was off, leak in fill tubs inside the house on the south wall, birds look good.
March 18, 2008 (Garris) — educate new farm help of importance of egg temps and collection, issues in unit 1, flies, grass, garbage. Overall better but still needs a lot of work. Keep at it.
May 20, 2008 (Garris) — cool cells not working properly — major concern. One light out inside house. Cool cells working very poorly. You are getting little to no effort from them this needs to be addressed ASAP. Dead bird drum is full and birds on ground. This | ^need to be composted daily. 6 lights out in house. 3 rooster pans off. Also some slat sticks need to be fixed. Each house has four lights not working; each house has male pans off. Cool Cells not working properly — filters on cool cells look clogged with algae. Dead bird drums are full with dead birds on ground. One good thing — collection room clean, coolers cool. These issues need to be addressed ASAP.
Deposition excerpts of Chris Ovitt were submitted in opposition to the summary judgment. Ovitt had no idea why the banker was called in for the August 1, 2008 meeting. Ovitt knew that Volentine expended large sums to do a lot of work on the farm. Ovitt stated that the bonuses were given to farmers for doing well. Ov-itt could not remember what happened regarding Volentine’s last two flocks. He had no part in the decision to terminate Volentine’s contract.
After these initial offerings of evidence by the parties, a second round of evidence in support of and in opposition to the summary judgment was allowed to follow. In a supplemental motion for summary judgment, Raeford offered portions of Holloway’s deposition. Holloway stated that Garris called him several times prior to the meeting but he could not recall who asked him to be at the meeting. Garris called him on a regular basis in early 2008 to complain about Volentine’s farm. Holloway had been out to Volentine’s farm five to six times to verify and inspect the problems. He was not concerned about the loan and everything out there looked fine to him. He did not see cool cell streaking issues as had been reported. He had gone to other farms and seen worse cases. He did not verify a single accusation including alleged problems with the driveway and roads.
The motion for summary judgment was heard on June 14, 2012. Counsel submitted the matter on the record without argument. On August | ml, 2012, the trial court rendered written reasons for judgment granting Raeford’s summary judgment on all claims. The court determined that “plaintiffs have failed to demonstrate any summary judgment evidence, other than speculation that the defendants acted with malice or without good faith in terminating the contracts with or without cause.” The court also ruled that no claim for breach of contract exists if the party terminating the Contract provided proper notice and that it was undisputed that Raeford had complied with the provisions of Paragraph 16 of the Contract. A written final appeal- *752 able judgment followed on August 20, 2012. This appeal by Volentine ensued.

Discussion

On appeal, Volentine reurges the arguments made in opposition to the summary judgment. At issue are whether material fact issues remain relating to Volentine’s performance under the Contract and Raeford’s good faith termination of the Contract. Raeford asserts that it undisputedly established the two conditions of Paragraph 16 of the Contract for termination of the Contract “without cause.”
We review the grant of a motion for summary judgment de novo. Schroeder v. Board of Supervisors of Louisiana State University, 591 So.2d 342 (La.1991); Dowdy v. City of Monroe, 46,693 (La.App.2d Cir.11/2/11), 78 So.3d 791; Beckham v. Jungle Gym, L.L.C., 45,325 (La.App.2d Cir.5/19/10), 37 So.3d 564. A motion for summary judgment will be granted if the pleadings, depositions, answers to interrogatories, and admissions, together with the affidavits, if any, show that there is no |17genuine issue as to material fact and that the mover is entitled to summary judgment as a matter of law. La. C.C.P. art. 966(B). Only evidence admitted for purposes of the motion for summary judgment shall be considered by the court in its ruling on the motion. La. C.C.P. art. 966 E(2). A fact is material if it potentially ensures or precludes recovery, affects a litigant’s ultimate success, or determines the outcome of the legal dispute. A genuine issue of material fact is one as to which reasonable persons could disagree; if reasonable persons could reach only one conclusion, there is no need for trial on that issue and summary judgment is appropriate. King v. Illinois Nat. Ins. Co., 08-1491 (La.4/3/09), 9 So.3d 780.
If the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant’s burden on the motion does not require him to negate all essential elements of the adverse party’s claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party’s claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact. La. C.C.P. art. 966(C)(2).
The question of whether material issues of fact remain in this case turns upon Raeford’s right to seek dissolution of the Contract for Volentine’s nonperformance or its right to terminate the Contract without cause. The trial court placed much emphasis for its ruling on Paragraph 16 of the Contract which provides the right of at-will termination by either |1Rparty during the time between flocks when birds are not present on the Volentine farm. While Raeford announced its intention to terminate the Contract in August of 2008 with Volentine in possession of flocks, Volentine apparently continued to receive payments for eggs under the Contract thereafter until the birds were removed in September and October. Raeford then terminated the Contract effective November 1. If the at-will termination right of Paragraph 16 is absolute, the many facts regarding Volen-tine’s alleged mismanagement and nonperformance and Raeford’s harm and loss may be irrelevant for the consideration of summary judgment and whether material fact issues exist.
From our review of the Civil Code’s provisions on obligations and contracts, we find that the nature of the parties’ Contract falls in the category of contracts “for continuance and periodic performance.” See, La. C.C. arts. 1776, 1975, 2019, and *753 2024. The object of the Contract is not unlike the “output or requirements” contracts defined in Article 1975.[2] Although there are other aspects to the Contract, each party entered this agreement understanding that quantities of eggs would be required for the ongoing future needs of Raeford’s poultry business and that Volen-tine’s output of that product was dedicated for delivery and sale to Raeford. Certainly, Volentine’s intent for a continuous and periodic performance from Raeford under the bilateral contract contemplated an agreement of 119future duration extending to allow a return on the sizeable fixed investment required of him under the Contract.
The Civil Code’s articles for the contract for continuous or periodic performance have specific provisions regarding the termination of such contracts. Article 1776 contemplates that the contract may be subject to a resolutory condition. Article 2024 provides in its suppletive law for termination similar to Paragraph 16 of the parties’ Contract, as follows:
A contract of unspecified duration may be terminated at the will of either party by giving notice, reasonable in time and form, to the other party.
La. C.C. art.2024. Finally and most significant, Civil Code Article 1770 addresses the exercise of a resolutory condition depending on an obligor’s will, as follows:
A resolutory condition that depends solely on the will of the obligor must be fulfilled in good faith.
La. C.C. art. 1770.
Contracts have the effect of law for the parties and may be dissolved only through the consent of the parties or on grounds provided by law. Contracts must be performed in good faith. La. C.C. art. 1983. Good faith shall govern the conduct of the obligor and the obligee in whatever pertains to the obligation. La. C.C. art. 1759. The term bad faith means more than mere bad judgment or negligence and it implies the conscious doing of a wrong for dishonest or morally questionable motives. MKR Services, L.L.C. v. Dean Hart Const., L.L.C., 44,456 (La.App. 2 Cir.7/8/09), 16 So.3d 562; Bond v. Broadway, 607 So.2d 865 (La.App. 2d Cir.1992), writ denied, 612 So.2d 88 (La.1993). Bad faith is an intentional and malicious failure to 120perform. Revision Comment (c), La. C.C. art.1997. The determination of whether a party acted in bad faith is a factual issue. N-Y Associates, Inc. v. Board of Com’rs of Orleans Parish Levee Dist., 04-1598 (La.App. 4th Cir.2/22/06), 926 So.2d 20, writ denied, 06-0666 (La.5/26/06), 930 So.2d 31; Weeks v. T.L. James & Co., 626 So.2d 420 (La.App. 3d Cir.1993), writ denied, 630 So.2d 794 (La.1994). Cf. Miller v. Conagra, Inc., 08-0021 (La.9/8/08), 991 So.2d 445.
In Revision Comment (f) to Article 1770, an at-will termination provision of a contract is addressed as follows:
[A] “termination at will” clause in a contract of long duration may be a fair clause properly bargained for or a trap set by the party with the greater bargaining power. The requirement of good faith stated in the second paragraph of this Article affords the protection needed by the victimized party in the latter kind of situation, and gives the courts necessary discretion to decide when to invoke it.
[[Image here]]
*754 In order to comply with the requirement of good faith, a party exercising his right to terminate a contract at will should consider not only his own advantage, but also the hardship to which the other party will be subjected because of the termination. Thus, a party to a requirements contract that chooses to terminate it because he has an opportunity to sell the same things elsewhere at a higher profit could violate the good faith requirement if the other party cannot find an alternative source of supply.
La. C.C. art. 1770, Revision Comment (f).
Professor Litvinoffs commentary further discussed these contracts of long duration, as follows:
Modern law is aware of the distinction between contracts giving rise to obligations that are performed in just one act, whereby the parties bind themselves for a short term, and contracts giving rise to continuous relations between the parties for a long term. In contemporary terminology the expression ‘transactional ventures’ designates contracts of either instantaneous or short term 1¾1 performance, while the expression ‘relational ventures’ has been coined to mean contracts , entered in order to govern the parties’ relations for a long time.
Saul Litvinoff, Force Majeure, Failure of Cause and Théorie de L’Imprévision: Louisiana Law and Beyond, 46 La.L.Rev. 84-35 (1985). He concluded by emphasizing the duty of good faith, as follows:
The overriding duty of good faith that the parties owe themselves reciprocally is thus enhanced in contracts of long duration. The emphasis is displaced from the individual end pursued by each of the parties to the end pursued in common by all of them, as if the contract were a joint-venture where the idea of opposed interests yields to the idea of a certain union of interests among the parties.
Id., 46 La.L.Rev. at 37.
In the present case, Raeford entered the Contract with an understanding of the expected performance by both parties as a long-duration contract. This was evidenced by Raeford’s right to specify features for the initial installation of Volen-tine’s production facilities and continuous renovations to the houses. The Contract thus called for Volentine’s long-term investment with expectation of return on that investment through the parties’ continuous performance. Thus, despite the inclusion of the at-will termination provision in the Contract, its exercise by Rae-ford terminating its obligation to provide chickens and pay Volentine for the production of eggs is proper only upon a showing of Raeford’s good faith. La. C.C. art. 1770. Such termination is not merely automatic and absolute upon Raeford’s election, justifying summary judgment as a matter of law by the operation of the contract. There are factual considerations present for the measure of Raeford’s good faith.
|22In explaining its good faith termination of the Contract, Raeford did not offer facts of its economic condition as justification. For example, Raeford did not assert that because of an economic downturn in its poultry business, it needed to curtail its overall supply of eggs by exiting some of its breeder contracts. Instead, Raeford asserts that it acted in good faith to terminate the Contract because of Volentine’s mismanagement as a breeder farmer. For the following reasons, we find that material fact issues remain regarding Raeford’s termination of the Contract and Volentine’s mismanagement.
The facts concerning Volentine’s management of his last flocks in 2008 are most relevant to this dispute. The catastrophic *755 loss of birds in 2007 did not result in a claim for dissolution of the Contract in 2007, but instead was resolved with Rae-ford’s additional requirement for improvements to Volentine’s facilities costing $116,000. The Contract continued.
While the record contains voluminous discussion of the activities in 2008 surrounding the last of Volentine’s flocks, we find no clear assessment of the extra cost or the measure of any actual economic loss by Raeford. In two unexplained exhibits submitted by the parties, it appears that in January of 2008, 28,154 hens were placed with Volentine, producing 2,836,080 eggs during their life cycle.[3] Volentine compared this result with another farmer who was delivered the exact same number of hens in October of 2007. The | Mother farmer’s birds produced 2,840,882 eggs.[4] Volentine’s submission of this comparison sought to show Raeford’s disparate treatment of the two farmers. Raeford’s only emphasis of this data was to argue that Volentine’s average production rate of 127.86 eggs per hen was below its expected average of 142 eggs per hen.
This is the only snapshot of an actual economic measure of Volentine’s farm for 2008. Yet, it remains largely unexplained and incomplete. The dollar amounts paid by Raeford to Volentine in 2008 for his delivery of eggs and the disputed bonus payments are never explained. His income from Raeford in 2008 is never revealed. If the 5.7 million eggs from the Volentine farm in 2008 cost Raeford more than they were worth, we might speculate that Volentine should have not been paid anything. On the other hand, Raeford’s large business enterprise has cost accounting measures that would reveal the value of the 5.7 million eggs which Volentine’s farm produced in 2008. Those eggs had a value within its production system for poultry products. Yet, there is no evidence comparing that value to the costs Raeford expended in 2008 on Volentine’s farm. From this lack of details of the economics of the parties’ relationship in 2008, the record only invites speculation. Yet, we find that information material for Raeford’s asserted good faith termination of the Contract.
Underlying Volentine’s opposition to the motion for summary judgment were certain facts and circumstances asserting that Raeford’s actions under the Contract were purely subjective and based upon ill will 124against him. He asserts that despite his $116,000 compliance in 2007, Raeford unreasonably delayed in providing him birds. That delay and his large capital expenditure placed him under financial stress. He testified that Ovitt admitted that he was instructed to highlight at least three management violations for every inspection in 2008. LeNarz admitted his personal conclusion formed after a short time period concerning Volentine’s poor management, despite Volentine’s prior history of satisfactory egg production for Raeford. Volentine asserts that his receipt of egg bonus payments in 2008 conflicts with Raeford’s unwarranted subjective scrutiny.
We find that Volentine’s opposition evidence along with the lack of explanation by Raeford of any monetary loss on Volen-tine’s 2008 egg production create material issues of fact regarding whether Raeford exercised good faith in its dealings with Volentine and its termination of the Contract. Volentine’s problems with management of his farm in 2008 may not have *756 been sufficient to amount to a breach of the Contract requiring its complete dissolution. For the same reason, Raeford’s attempted exercise of the at-will termination may not have been exercised in good faith. Accordingly, summary judgment being improper, we reverse the trial court’s ruling.
Finally, because the trial court’s nonspecific granting of summary judgment on the remaining issues was apparently tied to its ruling that Raeford had an absolute right to terminate the Contract under Paragraph 16, we also reverse the summary judgment on those issues and remand for | ^further proceedings for resolution of the fact issues identified in this opinion.

Conclusion

Finding material issues of fact, the judgment of the trial court granting summary judgment is reversed. The case is remanded for a full trial on the merits. Costs of this appeal are assessed to Rae-ford.
REVERSED AND REMANDED.
APPLICATION FOR REHEARING
Before WILLIAMS, CARAWAY, DREW, PITMAN and GARRETT, JJ.
Rehearing denied.

. Garris explained that broilers are a meat type bird processed to sell to customers. Breeders are the parent flock to the broiler, producing eggs that are hatched into broilers.

. La. C.C. art. 1975 provides: The quantity of a contractual object may be determined by the output of one party or the requirements of the other. In such a case, output or requirements must be measured in good faith.

. The same amount of birds had been received by Volentine in November of 2007, filling his other houses.

. Raeford’s unexplained and hardly legible Hen Report exhibit appears to show the other farmer producing an average of 127.70 eggs per hen.