| DAVID C. FLETTRICH, A PROFESSIONAL ENGINEERING CORPORATION | * | NO. 2025-CA-0409 |
|---|---|---|
| | * | |
| | | COURT OF APPEAL |
| | * | |
| VERSUS | | FOURTH CIRCUIT |
| | * | |
| DUDLEY DEBOSIER, A PROFESSIONAL LAW CORPORATION | * | STATE OF LOUISIANA |
| | * * * * * * * | |

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2022-11114, DIVISION "E"
Honorable Omar Mason, Judge
* * * * * *
**Judge Dale N. Atkins**
* * * * * *

(Court composed of Judge Tiffany Gautier Chase, Judge Dale N. Atkins, Judge Rachael D. Johnson)

Edward J. Koehl, Jr.
ATTORNEY AT LAW
6731 Canal Blvd
New Orleans, LA 70124

    COUNSEL FOR PLAINTIFF/APPELLANT, David C. Flettrich, A Professional Engineering Corporation

W. Paul Wilkins
Todd Bruno
G. Adam Savoie
DUDLEY DEBOSIER, APLC
1075 Government Street
Baton Rouge, LA 70802

    COUNSEL FOR DEFENDANT/APPELLEE, Dudley DeBosier, A Professional Law Corporation

**AFFIRMED**
**MARCH 5, 2026**

This civil dispute concerns allegations of breach of contract and amounts purportedly owed on an open account. Appellant, David C. Flettrich, A Professional Engineering Corporation ("Flettrich Corp."), seeks review of the trial court's March 3, 2025 judgment, which denied its "Petition for Damages on Open Account and for Breach of Contract" ("Petition"). Appellee is Dudley DeBosier, A Professional Law Corporation ("Dudley DeBosier"). For the following reasons, we affirm the trial court's judgment.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

**2017 Activity: Carbon Monoxide Exposure Incident and Expert Contract**

In late 2017, Dudley DeBosier hired Flettrich Corp. as an expert on a carbon monoxide exposure claim brought by its clients, Michael and Velma Casey (the "Caseys").[1] The alleged exposure occurred in August of that same year at the apartment complex where the Caseys lived at that time in Bossier City, Louisiana.

The contract between Flettrich Corp. and Dudley DeBosier ("Expert Contract") contained the following pertinent provisions:

---

[1] Though Dudley DeBosier initially filed the Caseys' petition for damages in state court against B.H. Management and Great American, those defendants ultimately had the matter removed to federal court.

1

**4.** **Payment Terms**

. . . .

[D.] [A]ny portion of an invoice for authorized services which exceeds the available monies in the retainer account shall be paid by Client upon receipt of invoice. . . . an invoice not paid within 10 (ten) days of receipt shall be considered overdue.

**6.** **Duties of Client.** The Client's duties specifically include, but are not limited to:

B. To make all payments as specified in paragraphs 4 and 5 under the terms as specified in paragraphs 4 and 5.

. . . .

D. To provide expert with copies of or access to **all** non-privileged, arguably relevant documents, evidence, or other materials in the case/project.

. . . .

M. To provide all stop work instructions to the Expert in writing.

N. To provide all time deadlines or cost-based or other restrictions to the Expert in writing. . . .

. . . .

**7.** **Duties of Expert.** The Expert's duties are:

. . . .

B. To formulate with honesty and due care and truthfully express Expert's opinion(s) in those areas (and only those areas) where Expert feels qualified to render an opinion and where Client has requested an opinion. Client agrees that Expert's opinion(s) are not preordained, might be contrary to Client's position, and are subject to modification as a result of new or additional information.

. . . .

[E.] [T]o prepare a written report if Client requests one.

**13.** **Disputes.** Where a dispute over an amount invoiced occurs, the following applies:

A. The Client must notify the Expert in writing that the Client is disputing an invoice within 10 (ten) days of receipt of invoice.

. . . .

C. The Client must produce any and all evidence substantiating any disputed amounts within 10 (ten) days of receipt of invoice.

**15. Additional Provisions**

. . . .

**B.** **Scope of Work.** Client is requesting that the Expert provide the following expert services:

1) Perform evaluation of the water heating and the heating, ventilating and air conditioning (HVAC) systems serving the specific apartment complex building in which carbon monoxide poisoning was an issue to determine compliance with building code regulations as well as the origin and flow of carbon monoxide in both the interior and the exterior of the apartment complex building, and render opinions in a written report.

The record establishes that Flettrich Corp. drafted the contract.[2]

**<u>December 2019 Activity: Reports</u>**

David C. Flettrich ("Mr. Flettrich"), P.E., president of Flettrich Corp., visited the Caseys' former apartment in August 2019; and Flettrich Corp. then issued a report on the conditions that Mr. Flettrich discovered that he deemed unsafe and "life safety concerns" in December 2019 (the "December 2019 Unsafe Conditions Report"). Mr. Flettrich contended his professional obligations compelled him to do so. Flettrich Corp. also issued its expert opinion in the Casey matter in December 2019 (the "December 2019 Expert Report"). Thereafter,

---

[2] More particularly, this was a form contract from Seak, "a very large expert witness company," but "over the years" Flettrich Corp. had "made slight modifications here and there."

Flettrich Corp. billed Dudley DeBosier for both Reports ("December 2019 Invoices").

### January 2020 Activity: First Stop Work Instruction

In response to Flettrich Corp.'s December 2019 Invoices, on January 3, 2020, Adam Savoie ("Mr. Savoie"), an attorney at Dudley DeBosier working on the Casey matter, emailed Mr. Flettrich and informed him that he found Flettrich Corp.'s billing to be "astounding." Additionally, Mr. Savoie instructed: "[P]lease do not perform any additional work on this file until instructed otherwise by the firm" ("January 2020 Stop Work Instruction"). Dudley DeBosier ultimately paid the December 2019 Invoices.

### May 2020 Activity: Forthcoming Deposition and Letter

Thereafter, on May 15, 2020, Mr. Flettrich learned that opposing counsel in the Casey matter wished to depose him. Then, on May 28, 2020, Mr. Flettrich sent a letter to Dudley DeBosier ("May 2020 Letter"). In pertinent part, the letter stated:

1.  In accordance with paragraph 6.D of our Expert . . . Contract . . . ., please provide me with copies of or access to all non-privileged, arguably relevant documents, evidence and other materials in the case/project that have not previously been provided to me. . . .

    Please note that I do not need to be provided any of the 86 court documents listed in the attached docket report that I printed from the Pacer [sic[3]] website . . . because I have access to each document contained in the docket report through my Pacer [sic] account.

    . . . .

3.  In accordance with paragraph 6.C of our Expert Contract, I request that you replenish the retainer by issuing a retainer check in the amount of $9,600.00, which will provide for an additional 32.0 hours of my time. Although the exact amount of

---

[3] PACER is the electronic records database for the federal courts. The Casey matter was in the federal court system.

the additional time that will be required of me is indeterminate, a retainer equal to the initial retainer amount of $3,600.00 that is specified in paragraph 4 of our Expert contract will provide for only 12.0 additional hours of my time and is clearly inadequate to compensate me (1) for the time I expended subsequent to December 21, 2019 (the last day that you were invoiced for my time), e.g., for the time I expended obtaining new information from the Office of the State Fire Marshal ("OSFM") and the City of Bossier, for the time I expended reviewing the 86 court documents . . .. (see ***ATTACHMENT 1***) for the purpose of determining what existing non-privileged, arguably relevant documents, evidence and other materials in the case/project have not yet been provided to me, etc., and (2) for the additional time that I will be required to expend, e.g., for the time I will expend preparing written correspondence, consulting with you, reviewing all new information, preparing a supplemental report, responding to discovery requests, organizing my files for production at my deposition, preparing for my deposition, reading and signing my deposition transcript, providing written statements identifying changes in form or substance to my deposition transcript, etc.

. . . .

5. Please provide me with the current deadline for supplementing my December 17, 2019 Expert Report. . . .

As delineated above, Mr. Flettrich requested that Dudley DeBosier replenish the retainer in the amount of $9,600. Mr. Flettrich contended this was necessary to compensate for the time he had expended working since December 2019, i.e., including work done after the January 2020 Stop Work Instruction, and for the additional time he intended to spend on the Casey matter performing the various tasks listed in Paragraph 3, including deposition-related tasks but also "preparing a supplemental report."

### June 2020 Activity: Second Stop Work Instruction and First Supplemental Report

In response to Mr. Flettrich's May 2020, letter, Mr. Savoie sent another email to him on June 3, 2020:

> Please do not perform any additional work on this case until you receive further instruction from our office. Further, please do not bill this firm for any work that has not been requested by you and approved by our office. This notice takes the place of any previous understanding you may have had on how and when to perform work in this case.

("June 2020 Stop Work Instruction").

Nonetheless, on June 12, 2020, Flettrich Corp. issued a supplemental report ("June 2020 Supplemental Report"). When testifying at the trial of this matter and asked why he prepared this report, Mr. Flettrich responded he had to do so because he had become aware of code violations at the Caseys' former apartment complex. Mr. Flettrich expounded this knowledge came from information he received subsequent to December 2019 from the Office of the State Fire Marshal and the City of Bossier in response to public records requests he made. As Mr. Flettrich explained, because he received the information after submitting his December 2019 Expert Report, he had not addressed the code violations in that report.

#### July 2020 Activity: Phone Call and Mr. Flettrich's Deposition

On July 27, 2020, prior to Mr. Flettrich's deposition, Mr. Flettrich and Mr. Savoie spoke by telephone. Mr. Savoie testified at the trial of this matter that he only authorized Mr. Flettrich to review ten deposition transcripts in preparation for his deposition and specifically instructed Mr. Flettrich not to perform any other work. Additionally, Mr. Savoie testified that he told Mr. Flettrich to separately bill for his deposition-related work. The record reflects Mr. Flettrich complied with this latter request.

According to Mr. Flettrich's trial testimony, he had already read one of the deposition transcripts (that of David Reed ("Mr. Reed")) prior to this call with Mr. Savoie because he had independently downloaded it from PACER. Further, Mr.

6

Flettrich testified he did not read all of the deposition transcripts before his deposition as instructed, instead reading some after the fact. One of the depositions Mr. Flettrich read after his deposition was that of James Koch ("Mr. Koch"). Mr. Flettrich testified that Mr. Reed's and Mr. Koch's depositions presented new information to him, chiefly that a flood had occurred in the boiler room of the Caseys' building mere days before the alleged carbon monoxide exposure incident.

Additionally, Mr. Flettrich testified that photographs introduced during his deposition of a dislodged vent pipe in the boiler room of the Caseys' building also constituted information that was new to him. Flettrich Corp. alleged these new pieces of information required Mr. Flettrich to once again supplement his report.

### August and September 2020 Activity: Reiterated Request for $9,600 and Retainer Replenishment

Subsequently, on August 10, 2020, Mr. Flettrich emailed Mr. Savoie and again requested a replenishment of his retainer "to cover the professional services described in detail in [P]aragraph 3 of [his] May 28, 2020 letter." Mr. Flettrich contended that, "[a]t a minimum, the retainer amount should be no less than the $9,600.00 requested in [P]aragraph 3 of his May 28, 2020 letter."

In a check dated September 14, 2020, Dudley DeBosier replenished Flettrich Corp.'s retainer in the amount of $9,600 on September 4, 2020 ("September 2020 Retainer Replenishment Payment"). In the letter Mr. Savoie sent with the payment, he stated: "Enclosed as requested is our firm's check . . . in the amount of $9,600.00 as replenishment of your retainer fee" ("September 2020 Retainer Replenishment Letter").

**December 2020 Activity: Second Supplemental Report and Invoice**

Then, on December 11, 2020, Flettrich Corp. submitted another supplemental report ("December 2020 Supplemental Report") to account for the new pieces of information Mr. Flettrich obtained since his June 2020 Supplemental Report, i.e., the dislodged vent pipe photographs and the flood in the Caseys' building prior to their carbon monoxide exposure.

On December 28, 2020, Flettrich Corp. submitted an invoice to Dudley DeBosier for work Mr. Flettrich performed from December 2019 to December 2020 ("December 2020 Invoice"), excluding his-deposition related work that he delineated in a prior invoice and that the September 2020 Retainer Replenishment Payment covered. The amount of the December 2020 Invoice less the amount remaining in the retainer account from the September 2020 Retainer Replenishment Payment was $29,362.68. Dudley DeBosier did not dispute the December 2020 Invoice in writing within ten days as the Expert Contract required but also did not pay it.

**December 2022: Petition**

That December 2020 Invoice is what Flettrich Corp. sought to recover with the filing of its Petition in December 2022. Therein, Flettrich Corp. named Dudley DeBosier as the sole defendant and alleged that Dudley DeBosier owed Flettrich Corp. the $29,362.68 delineated in the December 2020 Invoice.

**November 2024 Trial**

This matter proceeded to a judge trial in November 2024. In pertinent part, the parties introduced into evidence: the Expert Contract; Mr. Savoie's January 2020 Stop Work Instruction; Mr. Flettrich's May 2020 Letter; Mr. Savoie's June 2020 Stop Work Instruction; Mr. Flettrich's August 2020 Email; and Dudley

DeBosier's September 2020 Retainer Replenishment Payment and Letter. Additionally, the trial court heard testimony from Mr. Flettrich and Mr. Savoie. Though we have already incorporated parts of Mr. Flettrich's and Mr. Savoie's testimony in the preceding sections, we now summarize some other relevant pieces of their testimony.

### Mr. Flettrich's Testimony

When counsel for Dudley DeBosier asked Mr. Flettrich to confirm that he never received "anything in writing [from Dudley DeBosier] asking [him] in form or substance to deliver a written report other than" his December 2019 Expert Report, Mr. Flettrich conceded, "[that is] correct." Further, when counsel for Dudley DeBosier asked Mr. Flettrich about the Expert Contract's stop work provision (Paragraph 6.M) and the requirement that any stop work instructions be in writing, the following colloquy occurred:

> Q. [The stop work provision of the Expert Contract is] so simple and clear, no one can misinterpret that statement, right?
>
> A. You issued me a stop work instruction. I agree, you issued a stop work instruction.
>
> Q. But you [did not] stop working, did you?

Mr. Flettrich ultimately responded, "No" that he did not stop working after the January 2020 Stop Work Instruction. Counsel for Dudley DeBosier subsequently pressed further:

> Q. Did you ever receive another clear, unequivocal email, or correspondence, or anything in writing that says start working on this case again; yes or no?
>
> A. No. No, I [did not].

Similarly, regarding the June 3, 2020 Stop Work Instruction, Mr. Flettrich responded in the affirmative when asked whether the instruction contained therein

was "clear and unequivocal" and whether it satisfied Dudley DeBosier's duty to inform him to stop working as required by the Expert Contract.

Throughout his testimony, Mr. Flettrich indicated he had authority to issue his supplemental reports and keep working upon receiving new information for three reasons (1) Paragraph 7.B of the Expert Contract (in the "Duties of Expert" section); (2) concerns for life safety; and (3) Federal Rule of Civil Procedure 26. Counsel for Dudley DeBosier and Mr. Flettrich discussed this in more detail:

> A. Yeah, but it is the second sentence [of Paragraph 7.B of the Expert Contract] . . . . Client agrees that expert opinions are not preordained, might be contrary to client's position and are subject to modification as a result of new or additional information. You agreed to allow me to supplement my report based on new information. I got new information from the [Office of the State] [F]ire [M]arshal and the City of Bossier.
>
> Q. That [was not] information that I provided to you though, right?
>
> A. [Does not] matter. It [does not] say it has to be provided by you, new information.
>
> Q. You read this as a blank check that anytime you get new information you can just generate a new report?
>
> A. If [it is] pertinent to the case. That is what it says, new information. It [does not] say where it came from.
>
> Q. You mean to tell me that if you get new information tomorrow you can keep billing me?
>
> A. It depends on the information.
>
> (People laughing)
>
> A. No, I mean it depends on whether or not [it is] pertinent to the case.
>
> Q. All right. I think my point is made there, Mr. Flettrich. . . .
>
>     . . . .
>
> A. If I had gotten new information again, maybe I would have to write another report.

10

Q. There was no way Dudley Debosier could stop you from doing that if you got new information, was there?

A. If [I am] supposed to comply with the Federal Rules of Civil Procedure and my contract which allows me to, [I am] going to do the work necessary to supplement my report.

Q. Mr. Flettrich, [that is] probably the part [that is] most disturbing about all of this. Can you conceive of anything Dudley De[B]osier could have done differently to get you to stop working on this case other than send you two things in writing to get you to stop working?

. . . .

[A.] You [could have] terminated my services.

Upon hearing Mr. Flettrich's reply, counsel for Dudley DeBosier explained to Mr. Flettrich that firing him—as he suggested—would have required Dudley DeBosier to obtain and pay a new expert to prove the Caseys' claim even though they ultimately paid him nearly $75,000 to be their expert.

### *Mr. Savoie's Testimony*

Regarding Mr. Flettrich's December 2019 Unsafe Conditions Report, Mr. Savoie testified that Mr. Flettrich informed him of his intent to produce such a report but neither informed Dudley DeBosier of his intent to bill the firm for it or requested permission to bill for it. Mr. Savoie clarified that the December 2019 Expert Report was the only report that he had asked for because it contained the relevant evidence for the Casey matter, not the December 2019 Unsafe Conditions Report which delineated "a potentially unsafe condition as it existed in 2019" rather than in 2017 when the Caseys' carbon monoxide exposure occurred. Further, when asked whether there was "any time he called upon . . . Mr. Flettrich to do additional work or supplement the [December 2019 Expert] [R]eport" other than his deposition, Mr. Savoie responded, "No."

In light of same, Mr. Savoie stated he sent the January 2020 Stop Work Instruction because he "was taken aback by the amount that had been billed, taken aback by the fact that [Dudley DeBosier] had been billed for a report" it did not request (i.e., the December 2019 Unsafe Conditions Report). Mr. Savoie stated that his January 2020 Stop Work Instruction thus told "Mr. Flettrich on [sic] no uncertain terms" that he (Mr. Savoie) found Flettrich Corp.'s "bills to be astounding, and [Mr. Flettrich] needed to stop work on the Casey case." Mr. Savoie testified that with his June 2020 Stop Work Instruction, he likewise "tried to be as crystal-clear as [he] could possibly be" that Dudley DeBosier did not want Mr. Flettrich to perform any additional work unless and until he received further instruction from the firm to do so; asked Mr. Flettrich not to bill the firm for any work that had not been requested and approved; and emphasized that the notice was to supplant any prior understanding Mr. Flettrich had as to how and when to perform work on the Caseys' case. Mr. Savoie testified that he issued these Stop Work Instructions mindful that he "had an ethical obligation to [his] clients [the Caseys] to not waste their money."

Discussing Mr. Flettrich's deposition in more detail, Mr. Savoie recalled the July 27, 2020 phone conversation between him and Mr. Flettrich:

A. Mr. Flettrich's deposition was coming up on July 31. I had not spoken with him in months after the first and second stop work instructions. Mr. Flettrich was asking for several documents. He was asking for several depositions, and I asked for a phone conference off the clock[4] to discuss his deposition and how to move forward in the case. During that call I in no uncertain terms explained to him what he was going to receive, which ended up being 10 deposition transcripts in order to inform his opinions for the deposition. I specifically asked

_____

[4] Mr. Savoie stated at other times during the trial that, to a certain extent, he avoided communicating with Mr. Flettrich out of concern for how much Flettrich Corp. billed for their communications.

12

him to keep separate time for deposition related expenses simply because I knew he was going to do work for his deposition, and if he did work for his deposition and it was our responsibility to pay for it, then we would have to pay for it.

. . . .

Q. And so other than the July 27, 202[4] . . . phone call where you talked about what you wanted him to do in connection with the deposition, was there ever any request sent to Mr. Flettrich to go do any additional work, find additional documents, develop additional information?

A. No. In fact quite to the contrary during that phone call, I had already sent him one email telling him to stop work, [I had] sen[t] him another email telling him to stop work and he [was not] allowed to do anything that was not authorized by the firm which in that case would have been me. And during that phone call I made it crystal clear [I am] going to give you these ten depositions, not the 15 you want. [I am] not giving you all the other documents that you want and you can render opinions based upon the documents that are provided. I [do not] need anything else.

Insofar as he asked Mr. Flettrich to separate the charges for the deposition, Mr. Savoie explained he did so to "know exactly what [Mr. Flettrich's] time was for doing th[at] task . . . ." Mr. Savoie confirmed Dudley DeBosier paid Mr. Flettrich Corp. for same and testified that the September 2020 Retainer Replenishment Payment of $9,600 was "solely" for the deposition. Clarifying, Mr. Savoie explained he paid $9,600 because it "was what [he] estimated was going to be the cost of those deposition related task[s]." Mr. Savoie further testified the "$9[,]600 [payment] was never intended to authorize [Mr. Flettrich] to perform additional work on the case nor was it meant as a green light to go ahead and bill [for] . . . the work [Mr. Flettrich] had done after [the] first stop work instruction." When asked whether he made "any qualification" on the $9,600 payment, Mr. Savoie explained that the July 27, 2020 phone call and Mr. Flettrich's application of that money to his deposition-related invoice did so.

13

In terms of Mr. Flettrich independently downloading documents from PACER before his deposition, Mr. Savoie testified that apart from the ten deposition transcripts he instructed Mr. Flettrich to read before his deposition, he (Mr. Savoie) did not ask Mr. Flettrich to review any additional documents. Likewise, Mr. Savoie testified he did not tell Mr. Flettrich to perform any work after his deposition. Mr. Savoie stated that it was his, not Mr. Flettrich's, "ultimate decision on what documents to provide" to Mr. Flettrich based on his litigation strategy and he "only needed Mr. Flettrich to do what was asked."

Turning to the December 2020 Invoice from Flettrich, Mr. Savoie described it as "basically the bill for everything [Mr. Flettrich] did from the end of 2019 until the end of 2020" with the exception of the deposition-related tasks. Mr. Savoie testified he did not believe Dudley DeBosier was responsible for paying it because: "The contract said tell me to stop working in writing. I told him to stop working in writing once. I told him to stop working in writing twice and he kept working. [That is] why we were not going to pay the bill." When asked whether he "[could have] given [Mr. Flettrich] restrictions on spending money [and] on incurring expenses," Mr. Savoie responded, "I could have but I did something better. I told him to stop working. [That is] the ultimate restriction he just [did not] want to acknowledge it either time." Mr. Savoie confirmed that other than having previously issued the January and June Stop Work Instructions, Dudley DeBosier did not specifically dispute the December 2020 Invoice in writing within ten days of receipt. Further, Mr. Savoie confirmed Dudley DeBosier did not pay that invoice.

14

## March 3, 2025 Judgment And Reasons

At the conclusion of trial, the trial court ordered the parties to submit post-trial memoranda and then took the matter under advisement before issuing its March 3, 2025 judgment, which denied Flettrich's Petition.

The trial court also issued written reasons for judgment that day. The trial court reasoned that Dudley DeBosier's September 2020 Retainer Replenishment Payment adequately compensated Flettrich Corp. because it covered not only his deposition-related work but also those "amounts billed in the December 2020 [I]nvoice that . . . could plausibly be for work authorized by Dudley De[D]bosier." The trial court listed that work as 1) work undertaken before the January 2020 Stop Work Instruction and 2) the time Mr. Flettrich spent reviewing certain deposition transcripts before his deposition (e.g., that of Mr. Reed) that Mr. Savoie ultimately authorized him to review. Other than those two items, the trial court ruled "that the December 2020 [I]nvoice billed for work that Dudley De[B]osier did not authorize."

Regarding the other work delineated in the December 2020 Invoice, the trial court addressed Mr. Flettrich's assertion that Paragraph 7.B of the Expert Contract authorized him to perform it. The trial court found "that the parties did not intend the 'subject to modification' language [of Paragraph 7.B of the Expert Contract] to make any written stop-work instruction meaningless." Moreover, the trial court noted that the Expert Contract established "Flettrich[] Corp.'s duty to provide a 'written report' arose only if the client requested the same." The trial court also ruled "Flettrich[] [Corp.'s] reliance on [Federal] Rule [of Civil Procedure] 26 was unavailing, as it sets forth 'a party's duty,' and [Flettrich Corp./Mr. Flettrich] was

15

neither a party nor the representative of a party in the [carbon monoxide exposure] case."

Additionally, the trial court concluded Dudley DeBosier was not in breach of the contract for failing to submit written notice of its dispute of the December 2020 Invoice within ten days of receipt because it had already twice issued stop work instructions to Flettrich Corp. In its reasons for judgment, the trial court also noted it had not awarded attorney's fees to Flettrich Corp. under the Louisiana Open Account Statute, La. R.S. 9:2781(A), because it had not ruled in Flettrich Corp.'s favor.

## ASSIGNMENTS OF ERROR

In its brief to this Court, Flettrich Corp. asserts eleven assignments of error:

1. The [t]rial [c]ourt erred as a matter of fact in failing to find that [Flettrich Corp.] began requesting payment of the $9,600 retainer replenishment by letter of May 28, 2020[,] to Mr. Savoie, an attorney with Dudley DeBosier, for the purpose of preparing written correspondence, consulting with Mr. Savoie, reviewing all new information, preparing a supplemental report, etc.

2. The [t]rial [c]ourt erred as a matter of law in failing to hold that [Dudley DeBosier's] January 3 and June 3, 2020 stop work instructions to [Flettrich Corp.] were issued in bad faith and breached paragraph 7.B. of the Expert Contract.

3. The [t]rial [c]ourt erred as a matter of law in failing to hold that [Dudley DeBosier's] January 3 and June 3, 2020 stop work instructions to [Flettrich Corp.] breached paragraph 6.D. of the Expert Retention Contract ("Expert Contract") by failing to timely provide [Flettrich Corp. with] the depositions of [Mr.] Reed (February 19, 2020) and [Mr.] Koch (May 15, 2020) concerning the flooding of the boiler room and were voided by defendant's obligation to obtain and provide [Flettrich Corp.'s] Supplemental Expert Report No. 1 under Federal Rule of Civil Procedure 26.

4. The [t]rial [c]ourt erred as a matter of fact in failing to hold that during [Mr.] Flettrich's July 31, 2020 deposition he was shown photographic exhibits of a dislodged vent pipe serving old boiler #1 and the extent and height of the flooding of the boiler room which was

16

new and additional information he was unaware of prior to the preparation of his June 12, 2020 Supplement Expert Report No. 1.

5. The [t]rial [c]ourt erred as a matter of law in failing to hold that the new and additional information produced during the July 31, 2020 deposition of Mr. Flettrich would affect his previous opinions and would require his supplemental report in accordance with Fed. R. Civ. P. 26(e)(2).

6. The [t]rial [c]ourt erred as a matter of law in denying [Flettrich Corp.'s] recovery for expert services rendered in preparation of Supplemental Expert Report No. 2 dated December 11, 2020, which contained new and additional information not available prior to the June 12, 2020 Supplement Expert Report No. 1.

7. The [t]rial [c]ourt erred as a matter of fact in failing to hold that [Flettrich Corp.] rescinded its January 3 and June 3, 2020 stop work instructions by its September 14, 2020 retainer replenishment payment of $9,600 "as requested" in response to [Flettrich Corp.'s] letter of May 28, 2020[,] and email of August 10, 2020.

8. The [t]rial [c]ourt erred as a matter of law in failing to hold that [Dudley DeBosier] rescinded its January 3, 2020 and June 3, 2020 stop work instructions to [Flettrich Corp.] by [Dudley DeBosier's] September 14, 2020 $9,600 retainer replenishment payment.

9. The [t]rial [c]ourt erred as a matter of law in failing to hold that the professional services invoiced to [Dudley DeBosier] in [Flettrich Corp.'s] December 28, 2020 progress billing invoice number 9 ("PRB9") are the very same professional services that were described in detail in paragraph 3 of [Flettrich Corp.'s] May 28, 2020 letter, were referenced in [Flettrich's] August 10, 2020, email and were "authorized" by [Dudley DeBosier] in its September 14, 2020 retainer payment of $9,600 "as requested".

10. The [t]rial [c]ourt erred as a matter of law in failing to hold that [Dudley DeBosier] breached the Expert Contract by failing to pay [Flettrich Corp.'s] December 28, 2020 invoice PRB9 in the amount of $29,362.68 and by its failure to timely dispute [Flettrich's] December 28, 2020 invoice PRB9 within 10 days of receipt.

11. The [t]rial [c]ourt erred as a matter of law in denying [Flettrich Corp.'s] recovery of professional fees in the amount of $29,362.68 together with interest, costs and attorney fees pursuant to the Louisiana Open Account Statute. La. R.S. 9:2781.

In the argument section of its brief, Flettrich Corp. combines some of its assignments of error. That is, Flettrich Corp. separately argues assignments of error

numbers one and two. But, Flettrich Corp. argues assignments of error three through six together; assignments of error seven through nine together; and assignments of error ten and eleven together. Dudley DeBosier similarly combines its counterarguments to some of the assignments of error. Before resolving these issues, however, we must address a preliminary matter.

## PRELIMINARY MATTER

The trial court's March 3, 2025 judgment states, in relevant part, "that the Petition . . . filed by [Flettrich Corp.] is **DENIED**." The judgment did not state whether the denial was with or without prejudice. As this Court has explained, "Generally, a judgment that is silent as to a dismissal with or without prejudice must be construed as a dismissal 'without prejudice.'" *Allen v. State*, 2024-0294, p. 3 (La. App. 4 Cir. 11/14/24), 402 So.3d 34, 36 n.3 (quoting *Doe v. Jesuit High Sch. of New Orleans*, 2021-0284, p. 9 (La. App. 4 Cir. 11/10/21), 331 So.3d 426, 433). Thus, with no indication otherwise in the judgment, we construe the trial court's denial of Flettrich Corp.'s Petition as a denial without prejudice.

## DISCUSSUON

### Assignment of Error Number One: The May 2020 Letter

In the section of its brief addressing its first assignment of error, Flettrich Corp. points to the following statement in the trial court's written reasons for judgment: "[Mr.] Flettrich asked Dudley Deboiser to replenish the retainer account with $9,600, explaining that the increase was based on his anticipated work related to the deposition and based on hours he had already spent reviewing other records from the [Casey] file." Flettrich Corp. contends this factual finding was manifestly erroneous because Paragraph 3 of Mr. Flettrich's May 2020 Letter also stated he would spend time on written correspondence, consultation, reviewing new

18

information, preparing a supplemental report, etc. Accordingly, Flettrich Corp. asks this Court to reverse the trial court's finding. Dudley DeBosier counters the trial court's factual finding was correct based on the context of the letter (sent after Flettrich Corp. received the January 2020 Stop Work Instruction and after Flettrich Corp. learned that opposing counsel in the Casey matter sought to depose Mr. Flettrich); the credibility of Mr. Savoie's testimony (i.e., Mr. Savoie's testimony that in the July 27, 2020 phone call he instructed Mr. Flettrich to only review ten deposition transcripts to prepare for his deposition and to separate his billing for his deposition-related work); and the context of the September 2020 Retainer Replenishment Payment (the $9,600 payment covered Flettrich Corp.'s deposition invoice plus a modest retainer balance because Mr. Savoie had authorized the deposition-related work). With these arguments in mind, we turn to the applicable standard of review.

An appellate court should not set aside a trial court's findings of fact in a breach of contract case unless they are manifestly erroneous or clearly wrong. *IV Waste, LLC v. Jim Hotard Props., LLC*, 2023-0610, p. 23 (La. App. 4 Cir. 9/17/24), 400 So.3d 1008, 1025 (quoting *1100 S. Jefferson Davis Parkway, LLC v. Williams*, 2014-1326, p. 3 (La. App. 4 Cir. 5/20/15), 165 So.3d 1211, 1215). Similarly, "the existence of an open account is a question of fact subject to the manifest error standard of review." *La. Machinery Co. v. Bihm Equipment Co.*, 2019-1081, p. 4 (La. App. 1 Cir. 8/10/21), 329 So.3d 317, 321 (citing *Premier Tugs, LLC v. Caillou Island Towing Co.*, 2019-1166, p. 10 (La. App. 1 Cir. 6/18/20), 307 So.3d 218, 226). When an appellate court reviews a record "under the manifest error standard of review, the trial court's reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review."

*IV Waste, LLC*, 2023-0610, p. 27, 400 So.3d at 1027 (internal quotation marks omitted) (citations omitted). Further, under this standard of review, if "there are two permissible views of the evidence," then "the trial court's determination cannot be manifest error." *Id.* (internal quotation marks omitted) (citations omitted).

Flettrich Corp. assigns error to a statement in the trial court's written reasons for judgment. When a trial court delineates its findings in written reasons, "the appellate court is entitled to review the written reasons for insight into the trial court's judgment." *Kirton v. Ramelli Janitorial Serv. Payroll, L.L.C.*, 2021-0035, p. 8 (La. App. 4 Cir. 10/13/21), 366 So.3d 356, 361 n.7 (citing *Brady v. Pirner*, 2018-0556, p. 5 (La. App. 4 Cir. 12/5/18), 261 So.3d 867, 871 n.4). However, "appeals are taken from the judgment—not the written reasons for judgment." *Id.* Because the trial court's written reasons "are merely an explication of the trial court's" judgment, the written reasons "do not alter, amend, or affect the final judgment being appealed." *Sunset Harbour, L.L.C. v. City of New Orleans*, 2023-0379, pp. 7-8 (La. App. 4 Cir. 11/29/23), 378 So.3d 157, 163 (quoting *Wooley v. Lucksinger*, 2009-0571, 0584, 0585, 0586, pp. 77-78 (La. 4/1/11), 61 So.3d 507, 572).

Insofar as the trial court's written reasons "do not alter, amend, or affect the final judgment being appealed," Flettrich Corp. fails to establish how the trial court's finding affected the ultimate judgment, i.e., denial of its Petition. Even if the trial court misstated what [Mr.] Flettrich *requested* in his May 28, 2020 Letter, we find the more pertinent question is what the trial court found in terms of what Dudley DeBosier actually *authorized* in response to same. Requesting permission

20

is not the same as receiving permission. In other words, the fact that Mr. Flettrich asked to do multiple pieces of work does not mean he received approval to do so.

While the May 2020 Letter listed numerous activities that Mr. Flettrich planned to do, including the preparation of a supplemental report, the record establishes—as the trial court's reasons for judgment noted—that Dudley DeBosier did not actually authorize everything Flettrich Corp. requested. As Dudley DeBosier correctly argues, the trial court and this Court cannot consider Mr. Flettrich's May 2020 Letter in a vacuum. Rather, as delineated in the reasons for judgment, Mr. Savoie had already issued Dudley DeBosier's January 2020 Stop Work Instruction prior to Mr. Flettrich's May 2020 Letter; and Mr. Savoie issued the June 2020 Stop Work Instruction in response to Mr. Flettrich's May 2020 Letter. Then, during the July 27, 2020 phone conversation, Mr. Savoie only authorized Mr. Flettrich to review ten particular deposition transcripts to prepare for his own deposition. The trial court further found that when Flettrich Corp. submitted an invoice for work related only to Mr. Flettrich's deposition, the September 2020 Retainer Replenishment covered that amount and pertained solely to the deposition-related activities actually authorized by Dudley DeBosier. A review of the record establishes the trial court's findings in these regards were not manifestly erroneous or clearly wrong. This assignment of error is without merit.

### Assignment of Error Number Two: The Stop Work Instructions

In its written reasons for judgment, the trial court found Dudley DeBosier validly issued stop work instructions to Flettrich Corp., such that any work Flettrich Corp. performed after receiving those instructions was unauthorized (other than the deposition-related work that Dudley DeBosier did authorize). In its second assignment of error, Flettrich Corp. contends "[t]he [t]rial [c]ourt erred as a

21

matter of law in failing to hold that [Dudley DeBosier's] January 3 and June 3, 2020 [S]top [W]ork [I]nstructions . . . were issued in bad faith and breached paragraph 7.B. of the Expert Contract." Essentially, Flettrich Corp. argues Paragraph 7.B of the Expert Contract permitted it to ignore Dudley DeBosier's Stop Work Instructions. Further, Flettrich Corp. contends Dudley DeBosier issued the Stop Work Instructions "in bad faith." We will begin with Flettrich Corp.'s contention about Paragraph 7.B of the Expert Contract.

### *Paragraph 7.B of the Expert Contract*

We must consider and interpret the terms of the Expert Contract. Regarding the standard of review, this Court has held that "[t]he interpretation of the language of a contract is a question of law subject to the *de novo* standard of review on appeal." *1995 NOLA Holdings, L.L.C. v. Windy Hill Pictures L.L.C.*, 2023-0050, p. 12 (La. App. 4 Cir. 10/2/23), 376 So.3d 200, 209 (citation omitted). "Interpretation of a contract is the determination of the common intent of the parties." La. C.C. art. 2045. "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. C.C. art. 2046. "Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." La. C.C. art. 2050.

A contract is "subject to interpretation from the instrument's four corners without the necessity of extrinsic evidence," unless the contract is ambiguous in which case "the use of extrinsic evidence is proper." *Bodenheimer v. Carrollton Pest Control & Termite Co.*, 2017-0595, p. 7 (La. App. 4 Cir. 2/14/18), 317 So.3d 351, 357 (quoting *Fleet Intermodal Servs., LLC v. St. Bernard Port, Harbor & Terminal Dist.*, 2010-1485, p. 5 (La. App. 4 Cir. 2/23/11), 60 So.3d 85, 89). In

22

terms of the parties' intent, the courts consider a contract to be ambiguous if "it lacks a provision bearing on" the issue in dispute; the terms of the contract "are susceptible to more than one interpretation"; "there is uncertainty or ambiguity as to [the contract's] provisions"; or "the intent of the parties cannot be ascertained from the language employed." *1995 NOLA Holdings, L.L.C.*, 2023-0050, p. 11, 376 So.3d at 208 (quoting *Andry v. Omega Hosp., LLC*, 2019-0459, p. 6 (La. App. 4 Cir. 11/6/19), 282 So.3d 1170, 1174). Even if "one party . . . create[s] a dispute about the meaning of a contractual provision," this alone "does not render the provision ambiguous." *Id.* at p. 12, 376 So.3d at 209 (quoting *Campbell v. Melton*, 2001-2578, p. 9 (La. 5/14/02), 817 So.2d 69, 76).

A plain reading of the Expert Contract reveals no ambiguity. The stop work provision of the Expert Contract—Paragraph 6.M—required Dudley DeBosier "[t]o provide all stop work instructions to" Flettrich Corp. "in writing." With no other qualifying language besides the "in writing" requirement, it is clear the parties intended that Paragraph 6.M provided Dudley DeBosier with the authority to stop Flettrich Corp. from working so long as the instruction was in writing.

Paragraph 7.B of the Expert Contract required Flettrich Corp. "[t]o formulate with honesty and due care and truthfully express [its] opinion(s) . . . ." The provision further stated that "[c]lient (Dudley DeBosier) agrees" the opinion(s) "are subject to modification as a result of new or additional information." As Dudley DeBosier succinctly states in its brief, Paragraph 7.B "describes the nature of expert opinions," i.e., Flettrich Corp. was not bound by its original opinion if new or additional information affected same. For example, if Mr. Flettrich learned new information that affected the results he reached in his December 2019 Expert Report, he could testify to this effect during his deposition

23

or at trial. Mr. Flettrich was not bound to repeat what was in his December 2019 Expert Report no matter what; even if he no longer believed it to be correct; and even if it was unfavorable to Dudley DeBosier's position in the Casey matter. Paragraph 7.B of the Expert Contract gave him this leeway. Nonetheless, even if Flettrich Corp. obtained new or additional information, Paragraph 7.B did not grant Flettrich Corp. unilateral authority to continue working indefinitely and producing reports without Dudley DeBosier's authorization, especially in the face of stop work instructions that complied with the Expert Contract's writing requirement.

To hold, as Flettrich Corp. suggests, that it could continue working and producing reports any time Mr. Flettrich received "new or additional information" reads words into the contract that simply are not there. Further, to so hold, would render the stop work provision meaningless in contravention of contractual interpretation principles. *See* La. C.C. art. 2050 (instructing that "[e]ach provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole"). Moreover, as Dudley DeBosier observes, to interpret the contract as Flettrich Corp. suggests would mean the only way Dudley DeBosier could stop Mr. Flettrich from working would be to terminate his services. Such an action would mean that even though Dudley DeBosier had already paid tens of thousands of dollars to Flettrich Corp., Dudley DeBosier would then have to secure and pay a new expert just to stop Flettrich Corp. from billing for unauthorized work. Unlike the position espoused by Dudley DeBosier, Flettrich Corp.'s interpretation would lead to an absurd consequence in contravention of contractual interpretation principles. *Cf.* La. C.C. art. 2046 (providing that "[w]hen the words of a contract are clear and explicit and lead to no

absurd consequences, no further interpretation may be made in search of the parties' intent").

Moreover, La. C.C. art. 2056 provides: "In case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text." Mr. Flettrich testified that Flettrich Corp. furnished the Expert Contract to Dudley DeBosier, so we must interpret it against Mr. Flettrich. Thus, Flettrich Corp. is incorrect that Dudley DeBosier's Stop Work Instructions breached Paragraph 7.B. of the Expert Contract.

### Bad Faith

As noted previously, Flettrich Corp. also contends Dudley DeBosier issued the Stop Work Instructions "in bad faith." Flettrich lists purported breaches of the contract by Dudley Debosier as: (1) Mr. Savoie breached the notification provisions of the Expert Contract (Paragraph 6.N) when he failed to notify Mr. Flettrich that Dudley DeBosier had sought and obtained an extension of the initial expert report deadline from December 17, 2019, to June 12, 2020; (2) Mr. Savoie breached the payment provisions of the Expert Contract (Paragraphs 4.D and 6.B) by failing to timely pay Flettrich Corp.'s invoices from December 2019; and (3) Mr. Savoie breached the document production provision of the Expert Contract (Paragraph 6.D) because he did not timely provide Mr. Flettrich with Mr. Reed's deposition or the flooding information obtained from said deposition.

Louisiana Civil Code Article 1983 provides, in pertinent part, that "[c]ontracts must be performed in good faith." As this Court has previously explained, "Bad faith is not the mere breach of faith in not complying with a contract, but a designed breach of it from some motive of interest or ill will." *N-Y Assocs., Inc. v. Bd. of Comm'rs of Orleans Par. Levee Dist.*, 2004-1598, 1986, pp.

25

7-8 (La. App. 4 Cir. 2/22/06, 926 So.2d 20, 24 (citing *Fertel v. Brooks*, 2002-0846, p. 15 (La. App. 4 Cir. 9/25/02), 832 So.2d 297, 306 n.12). In other words, bad faith occurs when there "is an intentional and malicious failure to perform." *Volentine v. Raeford Farms of La., L.L.C.*, 48,219, pp. 19-20 (La. App. 2 Cir. 7/24/13), 121 So.3d 742, 753 (citing Revision Comment (c), La. C.C. art. 1997). "The term bad faith means more than mere bad judgment or negligence[,] and it implies the conscious doing of a wrong for dishonest or morally questionable motives." *Id.* at p. 19, 121 So.3d at 753 (first citing *MKR Servs., L.L.C. v. Dean Hart Constr., L.L.C.*, 44,456, p. 7 (La. App. 2 Cir. 7/8/09), 16 So.3d 562, 566; and then citing *Bond v. Broadway*, 607 So.2d 865, 867 (La. App. 2d Cir. 1992)). The trial court's "determination of whether a party to a contract acted in bad faith is a factual determination . . . subject to the manifest error/clearly wrong standard of appellate review." *N-Y Assocs., Inc.*, 2004-1598, 1986, p. 8, 926 So.2d at 24.

Apart from listing Dudley DeBosier's purported, above-delineated breaches of the Expert Contract, Flettrich Corp. did not brief the law on what constitutes bad faith in the breach of contract context and apply said law to Dudley DeBosier's supposed breaches. Rule 2-12.4(B)(4) of the Uniform Rules of the Courts of Appeal states that "[a]ll assignments of error and issues for review shall be briefed. The court may deem as abandoned any assignment of error or issue for review which has not been briefed." To properly brief an issue under that rule, a party cannot merely "[r]estat[e] an assigned error in brief without argument or citation of authority." *State v. Marie*, 2007-397, p. 3 (La. App. 5 Cir. 11/27/07), 973 So.2d 780, 781 (citing *State v. Lauff*, 2006-717, p. 9 (La. App. 5 Cir. 2/13/07), 953 So.2d 813, 819). *See also McCorvey v. McCorvey*, 2005-174, p. 6 (La. App. 3 Cir. 11/2/05), 916 So.2d 357, 363 (noting the appellant argued on appeal that the trial

26

court erred in denying his motion for change of venue, yet the appellant "cite[d] no case law in support of the change of venue"). Nonetheless, while we find Flettrich Corp.'s argument lacking, it did cite to La. C.C. art. 1983. Under the circumstances of the case, the more compelling ground to deny Flettrich Corp.'s bad faith argument is that the record simply does not support a finding that Dudley DeBosier's alleged breaches were "the conscious doing of a wrong for dishonest or morally questionable motives" or constituted "an intentional and malicious failure to perform." The trial court did not manifestly err in failing to hold Dudley DeBosier was in bad faith. In sum, Flettrich's second assignment of error lacks merit.

### Assignment of Error Number Five: Federal Rule of Civil Procedure 26's Applicability to Flettrich Corp.

We address Flettrich Corp.'s fifth assignment of error next (out of order) because its resolution has bearing on subsequent assignments of error. The trial court's written reasons for judgment state, in pertinent part, that "Flettrich[] [Corp.]'s reliance on [Federal] Rule [of Civil Procedure] 26 was unavailing" because that rule applies to a party to litigation, yet Flettrich Corp. was not a party in the Casey matter. In its fifth assignment of error, Flettrich Corp. asserts "[t]he [t]rial [c]ourt erred as a matter of law in failing to hold that the new and additional information produced during the July 31, 2020 deposition of Mr. Flettrich would affect his previous opinions and would require his supplemental report in accordance with Fed. R. Civ. P. 26(e)(2)." The trial court was correct.

Federal Rule of Civil Procedure 26(e) provides:

> **(1) In General.** A party who has made a disclosure under Rule 26(a)--or who has responded to an interrogatory, request for production, or request for admission--must supplement or correct its disclosure or response:

**(A)** in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing; or

(B) as ordered by the court.

**(2) Expert Witness.** For an expert whose report must be disclosed under Rule 26(a)(2)(B), the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition. Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due.

By its express terms, Fed. R. Civ. P. 26(e)(2) applies to a party, not to the expert witness himself. *See also In re Thilman*, 557 B.R. 294, 302-03 (Bankr. E.D.N.Y. 2016) (discussing Fed. R. Civ. P. 26(e) and explaining that "[a] proponent of an expert report has a duty to supplement or correct information in the report in a timely manner" and delineating when "[a] party's duty to supplement its initial expert report . . . arises").

Federal Rule of Civil Procedure 26(e) "anticipates that in complex litigation an expert witness may refine . . . his or her opinion as he or she prepares for trial." *Capitol Justice LLC v. Wachovia Bank, N.A.*, 706 F.Supp.2d 34, 38 (D.D.C. Dec. 8, 2009) (alteration in original) (citation omitted). However, as explained by the United States District Court for the Southern District of Florida, "Rule 26(e) 'is not a device to allow a party's expert to engage in additional work, or to annul opinions or offer new ones." *Riley v. Tesla, Inc.*, 603 F.Supp.3d 1259, 1270 (S.D. Fla. May 11, 2022) (citation omitted). With Fed. R. Civ. P. 26(e)(2), "experts are not free to continually bolster, strengthen, or improve their reports by endlessly researching the issues they already opined upon, or to continually supplement their opinions." *Minskoff v. Mendoza*, 797 F.Supp.3d 238, 254 (E.D.N.Y. Sept. 1, 2025).

Flettrich Corp. and Mr. Flettrich cannot use Fed. R. Civ. P. 26(e) as justification for his additional, unauthorized work and reports. As cited and quoted above, federal jurisprudence is clear that Fed. R. Civ. P. 26(e) does not give experts carte blanche. The new and additional information Mr. Flettrich learned during his deposition did not yield, as Flettrich Corp.'s arguments to this Court suggest, independent authorization for Mr. Flettrich to endlessly do additional work, produce supplemental reports, and bill Dudley DeBosier, particularly in the face of the firm's Stop Work Instructions.

Neither Flettrich Corp. nor Mr. Flettrich was a party to the Casey litigation, so Fed. R. Civ. P. 26(e)(2) did not impose a duty on them or require anything of them. Flettrich Corp.'s fifth assignment of error is without merit.[5]

### Assignment of Error Number Three: The Effect of the Stop Work Instructions in light of Federal Rule of Civil Procedure 26's Applicability to Dudley DeBosier and Paragraph 6.D of the Expert Contract

In its third assignment of error, Flettrich Corp. argues: "The [t]rial [c]ourt erred as a matter of law in failing to hold that [Dudley DeBosier's] January 3 and June 3, 2020 [S]top [W]ork [I]nstructions to [Flettrich Corp.] breached paragraph 6.D. of the Expert . . . Contract . . . by failing to timely provide [Flettrich Corp. with] the depositions of [Mr.] Reed (February 19, 2020) and [Mr.] Koch (May 15, 2020) concerning the flooding of the boiler room and were voided by [Dudley DeBosier's] obligation to obtain and provide [Flettrich Corp.'s] Supplemental Expert Report No. 1 under Federal Rule of Civil Procedure 26."

---

[5] Moreover, if Fed. R. Civ. P. 26(e)(2) imposed a duty/obligation on expert witnesses, then, by logical extension, the Federal Rules of Civil Procedure would also delineate a penalty (or penalties) to assess against an expert who violates it. Yet, the Federal Rules of Civil Procedure only list penalties the federal courts can assess against a party who violates Fed. R. Civ. P. 26(e)(2), not an expert. *See* Fed. R. Civ. P. 37(e)(2).

***Federal Rule of Civil Procedure 26's Applicability to Dudley DeBosier - The January 2020 Stop Work Instruction***

Beginning with Flettrich Corp.'s argument as to Fed. R. Civ. P. 26(e), that Rule's "duty to supplement . . . arises when the expert subsequently learns of information that was previously *unknown or unavailable*, and the new information renders the earlier report incomplete or inaccurate." *Minskoff*, 797 F.Supp.3d at 254 (citation omitted). In other words, "The triggering event for the duty to disclose" under Fed. R. Civ. P. 26(e) "is that the party 'learns that in some material respect the information is incomplete or incorrect.'" 8A FED. PRAC. & PROC. CIV. § 2049.1 (3d ed.). In terms of the January 2020 Stop Work Instruction, Mr. Savoie issued it in response to what he deemed the "astounding" billing associated with Flettrich Corp.'s December 2019 Unsafe Conditions Report and December 2019 Expert Report. At that juncture, nothing had triggered Fed. R. Civ. P. 26(e)'s disclosure requirement. That is, Mr. Flettrich had not yet contended he learned of new or additional information that purportedly required him to supplement his December 2019 Expert Report.

***Federal Rule of Civil Procedure 26's Applicability to Dudley DeBosier – The June 2020 Stop Work Instruction***

Turning to the June 2020 Stop Work Instruction, by this point in time, Mr. Flettrich had already contended in his May 28, 2020 Letter to Dudley DeBosier that he obtained new information requiring additions or changes to his December 2019 Expert Report. The rationale behind Fed. R. Civ. P. 26(e) is that a party's initial expert opinion should be complete, not "preliminary" or a "sneak preview of a moving target"; yet there may arise instances that "oblige[] a party to supplement or correct its disclosures upon information later acquired" in the interest of full disclosure to the opposing party. *Mariscal v. Graco, Inc.*, 52 F.Supp.3d 973, 983-

84 (N.D. Cal. June 26, 2014) (internal quotation marks omitted) (citation omitted). Accordingly, Fed. R. Civ. P. 26(e)(2)'s "supplementation requirement increases the quality and fairness of the trial by narrowing [the] issues and eliminat[ing] surprise." *Rivera-Marrero v. Presbyterian Cmty. Hosp.*, 255 F.Supp.3d 290, 296 (D. Puerto Rico June 12, 2017) (alteration in original) (citation omitted). If a party violates Fed. R. Civ. P. 26(e)'s duty to supplement, then the trial court has the discretion to exclude the party's evidence or assess other appropriate sanctions. *Id.*; Fed. R. Civ. P. 37(c)(1).

To the extent Mr. Flettrich's May 2020 Letter triggered Dudley DeBosier's obligation to disclose under Fed. R. Civ. P. 26(e), that is all it did. Dudley DeBosier still had the right to issue the June Stop Work Instruction under the Expert Contract. Nothing in Fed. R. Civ. P. 26(e) prevented Dudley DeBosier from doing so or voided the already-issued January 2020 Stop Work Instruction. In other words, Mr. Flettrich's May 2020 Letter did not override Dudley DeBosier's contractual right to issue the Stop Work Instructions. It merely required Dudley DeBosier to determine how to proceed in light of the new information Mr. Flettrich alleged he received and to face the possible sanctions delineated in Fed. R. Civ. P. 37(c)(1) if it incorrectly determined that supplementation under Fed. R. Civ. P. 26(e) was unnecessary. Accordingly, Flettrich Corp.'s argument that Fed. R. Civ. P. 26(e) voided the Stop Work Instructions is meritless.

### Paragraph 6.D of the Expert Contract

Flettrich Corp. also alleges Dudley DeBosier's violation of Paragraph 6.D of the Expert Contract voided the stop work instructions. Paragraph 6.D required Dudley DeBosier "[t]o provide [Flettrich Corp.] with copies of or access to all non-privileged, arguably relevant documents, evidence and other materials in the

case/project." Flettrich Corp.'s only argument about Paragraph 6.D in this section of its brief is that "Mr. Savoie's refusal to timely provide Flettrich with the Reed and Koch depositions undoubtedly constitutes a bad faith breach of [P]aragraph 6.D of the Expert Contract particularly considering the legal obligation of Mr. Savoie to comply with the requirements of Rule 26 of the Federal Rules of Civil Procedure."[6]

Even assuming arguendo that Flettrich Corp. is correct that Dudley DeBosier violated Paragraph 6.D, Flettrich Corp. fails to establish how this had any bearing on Paragraph 6.M, the stop work provision. As stated previously, Paragraph 6.M's only requirement was that any stop work instruction had to be in writing, and Dudley DeBosier complied with this. The Expert Contract contained no condition or caveat that Dudley DeBosier could not issue a stop work instruction if it had failed to comply with another provision of the contract. Though a breach of a contract by one party can excuse the second party from the contract, "not every breach" does so. *LAD Servs. of La., L.L.C. v. Superior Derrick Servs., L.L.C.*, 2013-0163, p. 11 (La. App. 1 Cir. 11/7/14), 167 So.3d 746, 755-56. Rather, it must be a substantial breach, and the first party's breach must be the actual cause of the second party's failure to comply with the contract. *Id.* at p. 13, 167 So.3d at 756. Flettrich Corp. fails to explain how Dudley DeBosier's alleged non-compliance with Paragraph 6.D's document production requirement caused Mr. Flettrich's failure to comply with the Stop Work Instructions. In fact, it would seem that Dudley DeBosier's alleged failure to provide documents to Mr. Flettrich would have served as the basis for Mr. Flettrich *not* to work rather than continuing to

---

[6] Having already analyzed the applicability of Fed. R. Civ. P. 26 to Dudley DeBosier in the preceding section, we find it unnecessary to discuss it again here.

work. Dudley DeBosier's alleged breach was not the cause of Flettrich Corp.'s non-compliance with the Expert Contract. It was Mr. Flettrich's unfounded belief that he was justified in and authorized to continue working and billing. Moreover, we note Flettrich Corp. did not provide the above-cited law regarding a substantial breach excusing the other party's non-performance in its brief to this Court. Again, Flettrich did not define bad faith or delineate what constitutes bad faith nor does it show how Dudley DeBosier's actions fit this definition. A party cannot simply say something is "undoubtedly" a bad faith breach with nothing to support this statement. *See* Uniform Rule 2-12.4(B)(4); *Marie*, 2007-397, p. 3, 973 So.2d at 781 (citation omitted); *McCorvey*, 2005-174, p. 6, 916 So.2d at 363. This argument is both meritless and not properly briefed.

Further, the contract provisions have to be read *in pari materia*. If Dudley DeBosier directed Flettrich Corp. to stop working in compliance with Paragraph 7.M of the Expert Contract, which it did, then why would Dudley DeBosier have to continue sending documents to Flettrich Corp. in compliance with Paragraph 6.D if Dudley DeBosier did not want Flettrich Corp. to review those documents and continue working? Dudley DeBosier's duty to disclose documents to Flettrich Corp. under the contract only existed when Flettrich Corp. needed said documents to perform authorized work. With the Stop Work Instructions in place, Flettrich Corp. did not need those documents. This held true unless or until Dudley DeBosier lifted the Stop Work Instructions entirely or directed Mr. Flettrich to review certain documents. (In this latter regard, Mr. Savoie ultimately did direct Mr. Flettrich to review the ten deposition transcripts during their July 27, 2020 phone conversation for the limited purpose of preparing for his deposition). To hold otherwise would be illogical.

Finally, we find Flettrich Corp.'s position to be disingenuous. Based on Flettrich Corp.'s arguments to this Court, if Dudley DeBosier had in fact sent the deposition transcripts to Flettrich Corp. upon receipt of same, then Flettrich Corp. would likely be arguing that this action constituted a rescission of the Stop Work Instructions and thus authorized Mr. Flettrich to review them and bill for said review. In conclusion, Flettrich Corp.'s third assignment of error is without merit.

## Assignment of Error Number Four: Photo of Dislodged Vent Pipe Shown to Mr. Flettrich During His Deposition

In its fourth assignment of error, Flettrich Corp. asserts that "[t]he [t]rial [c]ourt erred as a matter of fact in failing to hold that during [Mr.] Flettrich's July 31, 2020 deposition he was shown photographic exhibits of a dislodged vent pipe serving old boiler #1 and the extent and height of the flooding of the boiler room which was new and additional information he was unaware of prior to the preparation of his June 12, 2020 Supplement Expert Report No. 1." Flettrich Corp. asserts in its brief that Mr. Flettrich testified at trial that this photo of the dislodged vent pipe, among other "photographs that were introduced at his deposition[,] caused him to consider supplementing his report . . . as required by Fed R. Civ. P. 26(e)(2)." As delineated previously, Fed. R. Civ. P. 26(e)(2) imposed no requirements on Mr. Flettrich, a non-party to the Casey litigation. Thus, even if the trial court had found the photo was "new and additional information [Mr. Flettrich] was unaware of prior to the preparation of his June 2020 Supplemental Report," this is of no import. Federal Rule of Civil Procedure 26(e)(2) neither imposed a duty on Mr. Flettrich to supplement his prior reports nor authorized him to do so. This assignment of error is without merit.

## Assignment of Error Number Six: Denial of Recovery for Preparation of December 2020 Supplemental Report

In its sixth assignment of error, Flettrich Corp. asserts that "[t]he [t]rial [c]ourt erred as a matter of law in denying [its] recovery for expert services rendered in preparation of Supplemental Expert Report No. 2 dated December 11, 2020, which contained new and additional information not available prior to the June 12, 2020 Supplement Expert Report No. 1." One such piece of "new and additional information" was Mr. Flettrich's viewing of the aforementioned photographs of the vent pipe that Flettrich Corp. contends necessitated supplementation per Fed. R. Civ. P. 26(e)(2). The prior sections of this Opinion already detailed why this contention lacks merit.

Another piece of "new and additional information," according to Flettrich Corp., was Mr. Flettrich's July 27, 2020 receipt of the ten deposition transcripts he was to review prior to his own deposition. Flettrich Corp. states the ten "depositions included the deposition of Mr. Reed which provided new and detailed information related to the flooding of the . . . boiler room" in the Caseys' building. In the section of Flettrich Corp.'s brief addressing its sixth assignment of error, Flettrich Corp. merely alleges the information was "new and detailed." Flettrich Corp. does not provide any reasons in this section of its brief why the information required Mr. Flettrich to issue the December 2020 Supplemental Report or anything that purportedly authorized him to do so. To the extent Flettrich Corp. is again alleging Paragraph 7.B of the Expert Contract and Fed. R. Civ. P. 26(e)(2) authorized him to do so, this Opinion has already explained why that is not true.

In addition to noting Flettrich Corp.'s failure to adequately brief this argument, we find this assignment of error lacks merit.

## Assignment of Error Numbers Seven, Eight, and Nine: The September 2020 Retainer Replenishment Payment of $9,600

In its seventh assignment of error, Flettrich Corp. asserts that "[t]he [t]rial [c]ourt erred as a matter of fact in failing to hold that [Dudley DeBosier] rescinded its January 3 and June 3, 2020 [S]top [W]ork [I]nstructions by its September 14, 2020 [R]etainer [R]eplenishment [P]ayment of $9,600 'as requested' in response to Flettrich[] [Corp.'s] letter of May 28, 2020 and email of August 10, 2020." Then, in its eighth assignment of error, Flettrich Corp. contends that "[t]he [t]rial [c]ourt erred as a matter of law in failing to hold that [Dudley DeBosier] rescinded its January 3, 2020 and June 3, 2020 stop work instructions to [Flettrich Corp.] by [its] September 14, 2020 $9,600 retainer replenishment payment." Further, in its ninth assignment of error, Flettrich Corp. contends "[t]he [t]rial [c]ourt erred as a matter of law in failing to hold that the professional services invoiced to [Dudley DeBosier] in [Flettrich Corp.'s] December . . . 2020 . . . [I]nvoice . . . are the very same professional services that were described in detail in paragraph 3 of [Mr. Flettrich's] May 28, 2020 letter, were referenced in [Mr. Flettrich's] August 10, 2020, email and were 'authorized' by [Dudley DeBosier] in its September 14, 2020 retainer payment of $9,600 'as requested'." Essentially, Flettrich Corp. is arguing in its seventh and eighth assignments of error, respectively, that the trial court erred factually and legally by not deeming Dudley DeBosier's September 2020 Retainer Replenishment Payment to be a rescission of the Stop Work Instructions. Then, in the ninth assignment of error, Flettrich Corp. contends that the rescission of the Stop Work Instructions (via the September 2020 Retainer Replenishment Payment) meant the services listed in its December 2020 Invoice were authorized (with

Flettrich Corp. having requested to perform them in Mr. Flettrich's May 2020 Letter and August 2020 email) and owed by Dudley DeBosier.

In the section of its brief addressing these assignments of error, Flettrich Corp. merely contends that with the September 2020 Retainer Replenishment Payment, Mr. Savoie "acquiesced" to his retainer replenishment request; "replenished the retainer in the amount of $9,600 'as requested'"; "rescind[ed] [the] previous two stop work instructions"; and "authoriz[ed] Mr. Flettrich to bill Dudley DeBosier for the services described in paragraph 3 of the May 28, 2020 letter." Primarily, this section of the brief merely reiterates some of the timeline of events. Flettrich Corp. provides no argument, explanation, authorities, or briefing as to how and why Dudley DeBosier's September 2020 Retainer Replenishment Payment constituted a rescission of the Stop Work Instructions or an authorization for Flettrich Corp. to bill in December 2020 for the services listed in his May 2020 Letter and August 2020 email.

To the extent Flettrich Corp. focuses on the "as requested" language of Mr. Savoie's September 2020 Retainer Replenishment Letter, we find this referred to the *amount* requested, not the numerous activities Mr. Flettrich delineated in Paragraph 3 of the May 2020 Letter. To say that the mere phrase "as requested" authorized all of the activities listed in Paragraph 3 of the May 2020 Letter is a giant leap, especially in light of the context. (The context being that the two Stop Work Instructions remained in place, and Mr. Savoie testified that he gave clear instructions to Mr. Flettrich during their July 27, 2020 phone call that he was only authorizing Mr. Flettrich to review the ten deposition transcripts and sit for his deposition.) Instead, as the trial court explained in its written reasons for judgment, Dudley DeBosier's only exception to its Stop Work Instructions was its

authorization of Mr. Flettrich's deposition-related activity and nothing more. That finding was not manifestly erroneous or clearly wrong, so it does not serve as a basis for reversal. The September 2020 Retainer Replenishment Payment did not rescind the Stop Work Instructions, and the services listed in Flettrich Corp.'s December 2020 Invoice were not authorized. Flettrich Corp.'s seventh, eighth, and ninth assignments of error are without merit.

## Assignment of Error Number Ten: Dudley DeBosier's Failure to Timely Pay or Dispute Flettrich Corp.'s December 2020 Invoice

In its tenth assignment of error, Flettrich Corp. asserts that "[t]he [t]rial [c]ourt erred as a matter of law in failing to hold that [Dudley DeBosier] breached the Expert Contract by failing to pay [Flettrich Corp.'s] December . . . 2020 [I]nvoice . . . in the amount of $29,362.68 and by its failure to timely dispute [Flettrich Corp.'s] December . . . 2020 [I]nvoice . . . within 10 days of receipt." Dudley DeBosier counters, in pertinent part, that Flettrich Corp. substantially breached the Expert Contract thereby excusing Dudley DeBosier's alleged non-performance.

We find Dudley DeBosier's counter argument has merit. As previously explained, a breach of a contract by one party excuses non-performance by the other party if the first party's breach is substantial in that it related to the second party's non-compliance. *LAD Servs. of La., L.L.C.*, 2013-0163, pp. 11-13, 167 So.3d at 756. *See also Stuart Servs., L.L.C. v. Nash Heating & Air Conditioning, Inc.*, 2023-00015, p. 1 (La. 3/14/23), 357 So.3d 337, 338 (citations omitted). Dudley DeBosier established at trial that Flettrich Corp. substantially breached the Expert Contract. Flettrich Corp. ignored the Stop Work Instructions and issued reports and performed work Dudley DeBosier had not requested and authorized.

38

After these breaches of the Expert Contract, Flettrich Corp. then generated the December 2020 Invoice based on same. Then, Dudley DeBosier did not timely dispute the December 2020 Invoice in accordance with the Expert Contract (i.e., Dudley DeBosier breached the contract). The breach of the Expert Contract by Flettrich Corp. directly related to Dudley DeBosier's breach because the one begat the other: if Flettrich Corp. had not breached the Expert Contract by performing unauthorized work, it would not have had any purported basis for generating the December 2020 Invoice to which Dudley DeBosier did not respond. Dudley DeBosier proved Flettrich Corp.'s breaches excused its breach. Accordingly, Flettrich Corp.'s tenth assignment of error lacks merit.

**Assignment of Error Number Eleven: Denial of Recovery Pursuant to the Louisiana Open Account Statute**

In its eleventh and final assignment of error, Flettrich Corp. argues that "[t]he [t]rial [c]ourt erred as a matter of law in denying [Flettrich Corp.] recovery of professional fees in the amount of $29,362.68 together with interest, costs and attorney fees pursuant to the Louisiana Open Account Statute. La. R.S. 9:2781." Flettrich Corp. does not offer any specific arguments on this assignment of error in the section of its brief addressing same. Flettrich Corp. merely contends that "[u]pon reversal of the [t]rial [c]ourt [j]udgment, this . . . Court should render [j]udgment in favor of Flettrich [Corp.] in the amount of $29,362.68 together with interest, costs and attorney fees pursuant to the Louisiana Open Account Statute. La. R.S. 9:2781."

In light of the above analysis regarding the arguments asserted in assignments of error numbers one through ten, we find this catchall assignment of

error is likewise without merit.[7] The trial court was not manifestly erroneous or clearly wrong in finding that the December 2020 Invoice—the basis for Flettrich Corp.'s Petition—sought repayment for unauthorized work. Thus, Flettrich Corp. failed to prove an open account.

**DECREE**

For the foregoing reasons, we affirm the trial court's March 3, 2025 judgment, which denied Flettrich Corp.'s Petition.

**AFFIRMED**

---

[7] We note Flettrich Corp. did not brief what a party must prove to succeed under Louisiana's open account statute.